**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 21-1042

(Consolidated with 21-1109)

VILLAGE OF MORRISVILLE, VERMONT,

*Petitioner,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

_____

VERMONT AGENCY OF NATURAL RESOURCES,

*Intervenor for Respondent.*

*On Appeal from the Federal Energy Regulatory Commission in
No. FERC-1: FERC-173FERC61156.*

## PROOF BRIEF FOR PETITIONER

CAROLYN ELEFANT
LAW OFFICES OF CAROLYN ELEFANT
7315 Wisconsin Avenue
Bethesda, Maryland 20814
(202) 297-6100
carolyn@carolynelefant.com

PAUL V. NOLAN
LAW OFFICE OF PAUL V. NOLAN
5515 17th Street North
Arlington, Virginia 22205
(703) 534-5509
pvnpvndiver@gmail.com

*Counsel for Petitioner*

March 18, 2024



## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW AND RELATED CASES

### I.    Parties and Amici

A.    Parties and Intervenors before the Federal Energy Regulatory Commission in the Proceeding below:

    1.    Parties:

- Village of Morrisville, Vermont

    2.    Intervenors:

- Vermont Agency of Natural Resources
- American Whitewater
- Vermont Paddler's Club

B.    Parties and Intervenors in this Court:

    1.    Petitioners:

- Village of Morrisville, Vermont

    2.    Respondent:

- Federal Energy Regulatory Commission

    3.    Intervenors:

- The Vermont Agency of Natural Resources filed for intervention on February 24, 2021.

### II.    Rulings under Review

A.    *Village of Morrisville, Vermont,* Declaratory Order on Waiver of Water Quality Certification, 173 FERC ¶61,156 (November 19, 2020) (Declaratory Order), JA __,

B.    *Village of Morrisville, Vermont,* Notice of Denial of Rehearing By Operation of Law and Providing For Further Consideration, 174 FERC ¶ 62,040 (January 21, 2021)(Notice of Denial), JA __, and

C.    *Village of Morrisville, Vermont*, Order Addressing Arguments Raised on Rehearing, 174 FERC ¶61,141 (February 24, 2021)(Rehearing Order), JA __.

## III.    Related Cases

No other cases are pending regarding the Commission orders on review. The

Commission order on review pending before this Court in *KEI (Maine)*

*Power Management (III) LLC, v. FERC*, Docket No. 20-1303 was dismissed

by Order dated June 1, 202

Counsel for Petitioner is aware of two related cases that are or may come

before this court or another appellate court:

- *Tower Kleber Limited Partnership,* Project No. 10615-059, 186 FERC ¶61,149 (February 27, 2024)(Order declaring waiver for failure to act within one year).
- *Nevada Irrigation District v. FERC,* (D.C. Cir. Docket No. 23-1342); a related case is pending before the Commission, Nevada Irrigation District, Project No. 2266-_-, *Supplemental Petition on*
- *Remand for Declaratory Order on Waiver of Certification Authority* (September 9, 2023).

/s/_Paul V. Nolan

March 18, 2024

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW AND
RELATED CASES ................................................................................ ii

   I.    Parties and Amici ................................................................ ii

   II.   Rulings under Review ......................................................... ii

   III.   Related Cases .................................................................... iii

TABLE OF CONTENTS ....................................................................... iv

TABLE OF AUTHORITIES ................................................................. vi

GLOSSARY OF ABBREVIATIONS ................................................... ix

JURISDICTIONAL STATEMENT ....................................................... 1

STANDARD OF REVIEW .................................................................... 2

STATEMENT OF THE ISSUE .............................................................. 3

STATUTORY AND REGULATORY PROVISIONS ............................ 3

STATEMENT OF THE CASE ............................................................... 4

   I.    INTRODUCTION AND OVERVIEW ...................................... 4
      A.   The Federal Power Act and Clean Water Act ........................... 5
      B.   The One-Year Limitation is Inviolate ...................................... 8
   II.   The Morrisville Hydroelectric Project Relicensing ..................... 13
      A.   First Reset of the One-Year Limitation Period: November 7, 2014 ........ 15
      B.   Second Reset of the One Year Limitation Period: September 9, 2015 .... 18
      C.   Final Environmental Assessment: December 15, 2014 ........................... 23
      D.   2016 Water Quality Certificate Issued: August 9, 2016 ......................... 24
      E.   The Commission's CWA §401(a)(1) Waiver Determination:
         November 20, 2020 ................................................................................ 25

SUMMARY OF THE ARGUMENT ....................................................... 33

ARGUMENT ......................................................................................... 34

I.   The Commission's Waiver Determination Violated §401(a)(1) Of The CWA ..................................................................................34

   A.   The Commission's Waiver Determination Violated The Plain Language Of §401(a)(1).............................................................34

   B.   The Commission's Interpretation of §401(a)(1) Is Inconsistent With The CWA's Purpose And Legislative History ...............................................35

II.  The Commission's Findings Are Unsupported By Substantial Evidence .....37

   A.   The Commission Erred When It Found That The Village Of Morrisville Acted Unilaterally In Withdrawing And Resubmitting Its Water Quality Certification Application ...........................................37

   B.   The Commission Erred When It Found That Vermont ANR Was Not Complicit In The Withdraw-And-Resubmit Scheme..............................38

   C.   The Commission Erred When It Found That There Was Not A Functional Agreement Between The Vermont Agency of Natural Resources And Morrisville To Coordinate The Withdrawal And Refiling Of Morrisville's Water Quality Certification Application.......................44

   D.   The Commission Erred In Its Determination That It Was Not Necessary To Determine Whether The Water Quality Certification Applications As Withdrawn And Resubmitted Differed ....................................48

CONCLUSION ...................................................................................52

CERTIFICATE OF COMPLIANCE.....................................................56

CERTIFICATE OF SERVICE ..............................................................57

v

# TABLE OF AUTHORITIES

**Court Cases**                                                    **Page(s)**

*Alcoa Power Generation, Inc. v. FERC*, 643 F.3d 963 (D.C. Cir. 2011)..................1

*City of Salisbury v. FERC*, 36 F.4th 1164 (D.C. Cir. 2021) ......................................2

*Hoopa Valley Tribe v. FERC*, 913 F.3d 1099 (D.C. Cir. 2019), *cert. denied*,
140 S. Ct. 650 (2019) ...................................... 1, 2, 5, 8, 10, 12, 25, 30, 31

*New York State Department of Environmental Conservation v. Federal
Energy Regulatory Commission (New York I)*, 884 F.3d 450 (2nd Cir. 2018) .........8

*New York State Department of Environmental Conservation v. Federal
Energy Regulatory Commission (New York II)*, 991 F.3d 439 (2nd Cir. 2021) ..2, 35

*Turlock Irrigation District and Modesto Irrigation District v. Federal
Energy Regulatory Commission*, 36 F.4th 1179 (D.C. Cir. 2022), *cert.
denied*, 143 S. Ct. 1746 (2023) ................................................................7, 42, 43

*Waterkeepers Chesapeake v. FERC*, 56 F.4th 45 (D.C. Cir. 2022) .........................7

**Administrative Orders and Proceedings**

*Central Vermont Public Service Corporation*, Project No. 2205-018, 113
FERC ¶61,167 (November 17, 2005) ......................................................8, 9, 10, 11

*Goose River Hydro, Inc.*, Project No. 2804-037, Order Terminating License
by Implied Surrender, 183 FERC ¶62,044 (2023)...................................................24

*Merced Irrigation District,* Project Nos. 2179 & 2467, 171 FERC ¶ 61,240
(2020), reh'g denied by operation of law, 172 FERC ¶ 62,098 (August 20,
2020) (consolidated, *California State Water Resources Control Board, et al.
v. FERC,* 43 F.4th 920 [9th Cir. 2022]) ...........................................................12, 13

*Moriah Hydro Corporation*, Project No. 12635-002, 173 FERC ¶ 62,132
(December 11, 2020)..................................................................................................6

*Pacific Gas and Electric Co.,* 170 FERC ¶ 61,232, at P. 40 (March 19, 2020) ......42

*Pacific Gas and Electric Company*, 172 FERC ¶61,064 (2020) .............................42

*Pacific Gas and Electric Company and Nevada Irrigation District,* 186 FERC 61,121 (2024) ..................................................................37

*South Feather Water and Power Agency,* 171 FERC ¶ 61,242, reh'g denied, 172 FERC ¶ 62,101 (2020) ..............................................42

*Southern California Edison Co.,* 170 FERC ¶ 61,135 (February 20, 2020) ..........42

*The Village of Morrisville, Vermont*, Project No. 2629-014, 173 FERC ¶61,156 (November 19, 2020)(Declaratory Order) ...........................................27, 54

*Tower Kleber Limited Partnership,* Project No. 10615-059, 186 FERC ¶61,149 (February 27, 2024)(Declaratory Order)...............................................5, 7, 9

## Other Authorities

Vermont Agency of Natural Resources, Department of Environmental Conservation, *Section 401 Water Quality Certification Practice* (2014) ("Procedure Manual") ......................................................................3, 11, 16, 22, 45

Vermont Water Pollution Control Permit Regulations............................3, 16, 18, 46

## Statutes & Regulations

18 U.S.C. §1001 ...................................................................................................29

Administrative Procedure Act. 5 U.S.C. §§551–559.................................................2

 Clean Water Act, 33 U.S.C. §1251 et seq............................. 2, 5, 11, 25, 28, 29, 34, 35, 36, 40, 42, 43, 48, 52, 53

    §401, 33 U.S.C. §1341 ............................................. 1, 2, 4, 8, 11, 21, 26, 29, 30, 31, 35, 39, 42, 46

    §401(a)(1), 33 U.S.C. §1341(a)(1) ................. 3, 4, 5, 6, 8, 10, 13, 25, 31, 33, 34, 35, 36, 40, 43, 46, 50, 52, 54

Federal Power Act, 16 U.S.C. §§791a-825r ...............................5, 6, 7, 8, 43, 52, 53

    16 U.S.C. §825l(b)..............................................................................1, 2

Scope of Review

    5 U.S.C. §706(2)(A) ...........................................................................2

18 C.F.R. § 5.23(b)(1)(ii)..................................................................5, 17, 38

18 C.F.R. § 5.23(b)(2).................................................................................5

40 C.F.R. § 121.7(a)...................................................................................7

D.C. Cir. Rule 28(f)....................................................................................3

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Vermont ANR | Vermont Agency of Natural Resources (agency) |
| Commission | Federal Energy Regulatory Commission |
| CWA | Clean Water Act, 33 U.S.C. §1251 et seq |
| DEC | New York State Department of Environmental Conservation |
| Declaratory Order | *Village of Morrisville, Vermont,* Declaratory Order on Waiver of Water Quality Certification, 173 FERC ¶61,156 (November 19, 2020) |
| EPA | U.S. Environmental Protection Agency |
| FPA | Federal Power Act, 16 U.S.C. §§791a-825r |
| February Order or Rehearing Order | *Village of Morrisville, Vermont,* Docket No. P-2629-028, Order Addressing Arguments Raised On Rehearing, 174 FERC ¶ 61,141 (February 24, 2021) ("Rehearing Order") |
| FERC | Federal Energy Regulatory Commission |
| *Hoopa Valley* | *Hoopa Valley Tribe v. FERC* , 913 F.3d 1099 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 650 (2019) |
| *Merced Irrigation District* | *Merced Irrigation District,* Project Nos. 2179 & 2467, 171 FERC ¶ 61,240 (2020), reh'g denied by operation of law, 172 FERC ¶ 62,098 (2020). |
| MW | megawatt |
| MWL or MW&L | Morrisville Water and Light Department |
| *Nevada Irrigation District* | *Nevada Irrigation District*, Project No. 2266-102, 171 FERC ¶ 61,029 (2020), on reh'g, 172 FERC ¶ 61,082 (2020) |

| *New York I* | *New York State Department of Environmental Conservation v. Federal Energy Regulatory Commission*, 884 F.3d 450 (2nd Cir. 2018) |
|---|---|
| *New York II* | *New York State Department of Environmental Conservation v. Federal Energy Regulatory Commission*, 991 F.3d 439 (2nd Cir. 2021) |
| NID | Nevada Irrigation District |
| VWPCPR | Vermont Water Pollution Control Permit Regulations |
| Notice of Denial | *Village of Morrisville, Vermont,* Docket No. P-2629-028, Notice Of Denial Of Rehearing By Operation Of Law And Providing For Further Consideration, 174 FERC ¶ 62,040 (January 21, 2021) |
| P | Internal paragraph number in a FERC Order |
| WQC | Water Quality Certification |
| *Yuba County Water Agency* | *Yuba County Water Agency*, Project No. 2246-065, 171 FERC ¶ 61,139, on reh'g, (2020) |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the Commission's Orders under 16 U.S.C. § 8251(b). On November 19, 2020, the Commission issued a Declaratory Order on Waiver of Water Quality Certification. JA___. On December 21, 2020, within thirty days of issuance of the Declaratory Order, Morrisville timely filed its Request for Rehearing. JA___. The Commission issued on January 21, 2020, Notice of Denial of Rehearing By Operation of Law and Providing For Further Consideration. A petition for review was timely filed on January 26, 2021 (No. 21-1042) within sixty days of the Notice. The Commission issued on February 24, 2021, Order Addressing Arguments Raised on Rehearing. JA___. A petition for review was filed on April 23, 2021 (No. 21-1109).

Furthermore, whether a State agency has waived the certification requirement under Section 401 is a question of federal law that is within the Court's subject-matter jurisdiction. *See Alcoa Power Generation, Inc. v. FERC, 643 F.3d 963, 972 (D.C. Cir. 2011); see also Hoopa Valley Tribe v. FERC, 913 F.3d 1099, 1103 (D.C. Cir. 2019).*

Morrisville, as project owner and licensee, is directly aggrieved by the orders on review. The injury to its interests is capable of redress because FERC can issue a waiver. The Morrisville Petitions for Review challenge final Commission orders that disposed of all of Morrisville's claims before the Commission.

1

## STANDARD OF REVIEW

The Commission does not administer the CWA. "[B]ecause FERC is not the agency charged with administering the CWA, the Court owes no deference to its interpretation of Section 401 or its conclusion regarding the states' waiver." *Hoopa Valley,* 913 F.3d at 1099. *Accord New York State Department of Environmental Conservation v. Federal Energy Regulatory Commission (New York II),* 991 F.3d 439, 445 (2nd Cir. 2021) ("We review de novo FERC's interpretation of the Clean Water Act, a statute it does not administer"). Thus, the Commission's interpretation of the CWA is subject to the Court's *de novo* review.

This Court accepts findings of fact supported by substantial evidence (16 U.S.C.S. § 825l(b)), and also considers whether the decision is arbitrary and capricious under the Administrative Procedure Act. 5 U.S.C.S. § 706(2)(A). "A decision is not arbitrary if it is reasonable and reasonably explained." *City of Salisbury v. FERC*, 36 F.4th 1164, 1170 (D.C. Cir. 2021).

## STATEMENT OF THE ISSUE

Whether the Commission's conclusion that the Vermont Agency of Natural Resources (Vermont ANR) had not waived its certification authority under section 401(a)(1) of the Clean Water Act, despite not taking action within a reasonable period of time on a request for certification by the Village of Morrisville, Vermont (Morrisville) was arbitrary, capricious and unsupported by substantial evidence because the Commission (erroneously) found that that Morrisville had unilaterally withdrawn and refiled its application twice over a thirty-one and a half month period that commenced on January 30, 2014 and concluded with issuance of a certificate on August 16, 2016.

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations are reproduced in the Addendum to this brief. D.C. Cir. Rule 28(f).

The addendum includes:

- Vermont Agency of Natural Resources, Department of Environmental Conservation, Section 401 Water Quality Certification Practice (2014)("Procedure Manual")

- Pertinent portion of Section 13.11 of Vermont Water Pollution Control Permit Regulations

## STATEMENT OF THE CASE

### I.    INTRODUCTION AND OVERVIEW

The Commission orders finding no waiver because Morrisville acted unilaterally in circumvention of Section 401(a)(1) are in error and ignore the implications of the orders by allowing future license applicants to avoid the one-year limitation by acting alone. Moreover, the orders are in error because they ignored twice substantial evidence submitted by Morrisville that it was threatened with harsher terms and conditions if Morrisville did not withdraw and resubmit a 401 water quality application, ignored the sole authority of Vermont ANR to act on an application with a reasonable period, not to exceed one year, and the significant authority of the agency to control the entire licensing process by imposition of mandatory terms and conditions, and ignored that with each withdraw and resubmission of a 401 application, Vermont ANR needed additional time to complete drafting a certificate, issuing a draft for public comment, conduct a hearing and issuing a certificate.

If unilateral action by Morrisville is a dance of avoidance, Vermont ANR set the tune and dance. As such, the Commission's orders are tone deaf to the realities of the subservient position of a municipal utility such as Morrisville to that of a state agency wielding significant authority over licensing, project operation through

mandatory certificate conditions, and ultimately the feasibility and practicality of accepting any license that the Commission may issue.

### A.    The Federal Power Act and Clean Water Act

Under section 401(a)(1) of the Clean Water Act (CWA),[1] a certifying agency must act on a water quality certification request within a reasonable period of time not to exceed one year. *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1103–04 (D.C. Cir. 2019) (quoting 33 U.S.C. § 1341(a)(1)). *Accord, Tower Kleber Limited Partnership,* Project No. 10615-059, Order On Petition for Declaratory Order, 186 FERC ¶ 61,149 (Feb. 27, 2024).

The Commission's regulations provide that: "[a] certifying agency is deemed to have waived the certification requirements of section 401(a)(1) of the Clean Water Act if the certifying agency has not denied or granted certification by one year after the date the certifying agency received a written request for certification." 18 CFR § 5.23(b)(2). The Commission's regulations *require an applicant submit to the Commission* (1) a copy of the request for certification, including proof of the date on which the certifying agency received the request. 18 CFR § 5.23(b)(1)(ii). When a state denies certification within the statutory one-year period, the Commission

---

[1] 33 U.S.C. § 1341(a)(1).

cannot issue a license."[2]   The Commission *requires an applicant to provide* a copy of the denial within 30-days after the applicant received it.

A state may deny certification with or without prejudice. A state  may also permit an applicant to refile for certification with the same application or a new (revised) application. **The significance is that denial** (with or without prejudice) puts before the Commission the opportunity to exercise its licensing authority under the FPA by deciding whether or not to proceed with processing a licensing application. Thus, Commission policy gives notice to a license applicant that the Commission *may dismiss the license* application 90 days after the denial; unless the applicant notifies the Commission within the 90-day period that is has filed a timely appeal of the denial, and/or that it has refiled its WQC request, then it will keep the license application on file. *See, e.g., Moriah Hydro Corporation*, Order Dismissing License Application, Project No. 12635-002, 173 FERC ¶ 62,132, P. 10, (December 11, 2020).

A certifying agency can act at any time. It does not need to coordinate with the applicant nor does the applicant need to act or have an intent to delay to its benefit. The state agency can (a) grant certification with or without conditions, (b)

---

[2] 33 U.S.C. §1341(a)(1).

deny certification with or without prejudice, or (c) expressly waive the certification requirement.

In *Tower Kleber Limited Partnership,*[3] the Commission provided a straightforward technique of analysis for determining whether a certifying agency has failed to act timely on an application that can be summarized as follows: (1) establish the date of receipt of the certification request; and (2) determine whether the certifying agencies actions constituted a failure to act within one year. With regard to the latter, the Commission held that: (1) the Commission must determine whether a certifying agency's actions constituted a failure or refusal to act within one year; (2) a certifying agency and an applicant, even by mutual agreement, cannot circumvent the one-year deadline; (3) a certifying agency's reason for delay is immaterial.

Granting or denying a certification request allows the Commission to proceed with its licensing responsibilities under the FPA. Resetting the one-year period, whether done with concerted activity, *e.g.,* an agreement between a state certification agency and an applicant, or "unilaterally" by an applicant, can

---

[3] *Tower Kleber Limited Partnership*, 183 FERC PP 15, 19, (fn. 43 – "The 2023 rulemaking retained the definition to act from a 2020 rulemaking that established four definitive methods for a certifying authority to act: (1) grant certification; (2) grant certification with conditions; (3) deny certification; or (4) waive certification. *See* 40 C.F.R. § 121.7(a) (2023)"). *See also, Turlock Irrigation Dist. v. FERC,* 36 F.4th 1179, 1184 (D.C. Cir. 2022), *cert denied,* 143 S. Ct. 1746 (2023); and *Waterkeepers Chesapeake v. FERC*, 56 F.4th 45, 47 (D.C. Cir. 2022).

circumvent the Commission's authority and responsibilities under the FPA. Of course, the certifying agency can address any abuse by denying an application with prejudice.

### B.    The One-Year Limitation is Inviolate

The one-year limitation period contained in §401(a)(1) is a *bright line* denominating the scope and limit of state authority that is inviolate.[4] *Hoopa Valley* made it clear that such schemes did not restart the one-year period in condemning a withdrawal and resubmission scheme where a state agency *worked with* an applicant to withdraw and resubmit an identical certification request before the expiration of the one-year statutory period in an effort to restart repeatedly the one-year clock. 913 F.3d at 1103, 1105.

The Commission's Order on Rehearing and Clarification in *Central Vermont Public Service Corporation*, Project No. 2205-018, 113 FERC ¶61,167 (Nov. 17, 2005) is relevant. The proceeding involved the Lamoille River Hydroelectric Development Project, a project located downstream of the Morrisville's Project.

---

[4] *See, e.g., New York State Department of Environmental Conservation v. Federal Energy Regulatory Commission (New York I)*, 884 F.3d 450, 454 (2nd Cir. 2018): "The plain language of Section 401 outlines a *bright-line rule* regarding the beginning of review: the timeline for a state's action regarding a request for certification 'shall not exceed one year' after 'receipt of such request.'" (footnote omitted, emphasis added).

Vermont ANR and the applicant had engaged in a protracted course of withdrawing and resubmitting applications for certification.

In *Central Vermont Public Service Corporation*. the Commission noted that "Central Vermont filed, withdrew, and refiled certification requests six times."[5] During that period, Vermont ANR and Central Vermont were acting within the scope of a settlement agreement. However, the one-year period involved with the sixth withdraw and resubmission had lapsed without Central Vermont withdrawing the current application before Vermont ANR. The Commission concluded that Vermont ANR "did not act on the application within one year,"[6] and as a result found that Vermont ANR had waived water quality certification."[7] In its Order on Rehearing, the Commission affirmed this finding: "Vermont failed to act on Central Vermont's March 1, 2004 application within one year of its receipt, and Commission staff was correct in concluding that this failure resulted in waiver of the agency's Section 401 authority."[8]

---

[5] *Central Vermont Public Service Corporation*, *infra* at P 6.

[6] *Id*. at P 14.

[7] *Id. See also, Tower Kleber Limited Partnership,* 186 FERC ¶ 61,149.

[8] *Id*. at P 16. "As a general matter, we find the language and intent of the Clean Water Act to be clear, and our regulations ... provide that failure to meet the one-year deadline will constitute waiver." *Id*. at P 21.

Vermont ANR had argued that a litigation settlement agreement remanding the §401(a)(1) application to Vermont ANR had the effect of extending the one-year review period. The Commission did not accept this argument: "Vermont's agreements with other parties are simply not relevant to the issue of whether it met the requirement of the Clean Water Act that it act on a certification application within one year, which it does not dispute it failed to do."[9]

The Commission noted in *Central Vermont* that Vermont ANR bore the responsibility for failing to ask Central Vermont to withdraw and resubmit its §401(a)(1) certification application: "It is only now, after the agency has failed, *apparently through its own error*, to get Central Vermont to withdraw and refile its application one more time, that Vermont invokes the power of the settlement and its interpretation of the purposes of the Clean Water Act."[10]

The Commission's acceptance of a withdrawal/resubmission scheme in *Central Vermont* is of note because the Commission could have declared the certification requirement waived at any time and did not have to await the expiration of a one-year period on the sixth iteration in a withdraw/resubmit scheme. As discussed above, such schemes were rejected subsequently in *Hoopa Valley*.[11]

---

[9] *Id*.

[10] *Id*. at P 19 (emphasis added).

[11] 913 F.3d at 1103, 1105.

The inadvertent waiver that occurred in *Central Vermont* was addressed in the Vermont Agency of Natural Resources, Department of Environmental Conservation, Section 401 Water Quality Certification Practice (2014). Addendum __. Specifically, sections §IV(b)(1) and (2) of the 2014 practice (procedure manual) provide:

(b)  **Coordination with Federal Agency; Decision Time Clock**.

(1)  Section 401 of the federal Clean Water Act provides that a state must act on a request for certification within a "reasonable period of time," which cannot exceed one year after receipt of the request, or the certification requirement shall be waived. …

(2)  *To avoid an inadvertent waiver of a WQC*, the 401 Program Coordinator will contact the involved federal agency upon receipt of a WQC application to determine the federal agency's timeframe for noticing and issuing its federal license or permit. The 401 Program Coordinator will document this timeline in writing. If more time is needed to make a decision, the 401 Program Coordinator will request an extension and confirm in writing. If the federal agency will not grant additional time, ***the Department may suggest to the applicant that it withdraw and resubmit its application, thereby restarting the clock, or the Department may deny the certification without prejudice*** if there is insufficient information to make a final decision and encourage the applicant to resubmit the application.

(emphasis added)

11

The Court in *Hoopa Valley* addressed the question of whether the repeated withdrawal and resubmission of an application without material changes would avoid the bright-line one-year limitation:

> PacifiCorp sent a letter indicating withdrawal of its water quality certification request and resubmission of the very same ... in the same one-page letter ... for more than a decade. *Such an arrangement does not exploit a statutory loophole; it serves to circumvent a congressionally granted authority over the licensing, conditioning, and developing of a hydropower project*.[12]

In subsequent cases involving withdrawal/resubmission schemes, *e.g.,* "resets," both the Commission and the courts sometimes have inquired as to whether there was a material difference between the withdrawn and resubmitted applications. In *Merced Irrigation District*, for example, the Commission noted that the withdrawals and resubmissions began in 2015 and that each was accomplished via a one- or two-page letter.[13] The Commission also noted that "[e]ach letter was substantively identical to the 2015 withdrawal and resubmittal letters."[14] Other inquires have included:  Did the project developer act alone? Did the developer receive assistance with the withdrawal/resubmission scheme? If the developer did

---

[12] 913 F.3d at 1104 (emphasis in original).

[13] 171 FERC ¶ 61,240 at P 8-9.

[14] *Id.* at P-12.

receive assistance, did it come from the state agency with §401(a)(1) certification authority or another branch of state government?

Other significant inquiries are whether the state agency actually assisted the applicant in a withdrawal/resubmission scheme;[15] and whether there was any type of an agreement between the applicant and the certification agency to withdraw and resubmit the certification request in order to avoid the one-year limitation of §401(a)(1). Irrespective of the nature of such agreements (*i.e.*, formal, informal, functional, etc.) Commission decisions and recent caselaw have made it clear that the use of such agreements as a means of avoiding the bright-line, one-year limitation of §401(a)(1) is unacceptable.

## II.    The Morrisville Hydroelectric Project Relicensing

Morrisville, with a population of approximately 2100, is a small village in the town of Morristown, Lamoille County, Vermont. The Morrisville Hydroelectric Project (Project) is a 4.99 megawatt (MW) hydroelectric project with four developments located on the Lamoille River, the Green River and the Elmore Pond Brook in Lamoille County, Vermont.

---

[15] In *Merced Irrigation District*, for example, the Board "invited Merced to contact the Board staff '[i]f you have any questions regarding this request or this process[.]'"171 FERC ¶ 61,240 at P 8, footnote 14.

On August 28, 1981, the Commission issued a 35-year license. Twenty-nine years later, Morrisville commenced the formal pre-filing agency consultation process for the submission of a new license (relicensing). Morrisville filed an application for a new license on April 25, 2013. JA __. The license expired on April 30, 2015. Nine years later, Morrisville continues to operate the project under an annual license. JA__.

Morrisville requested water quality certification on January 30, 2014. A copy of Vermont ANR's certification application form consisting of two preprint pages, without attachments, was filed by Morrisville with the Commission on February 2, 2014. JA __. In a February 3, 2014 letter to Morrisville, Vermont, ANR confirmed receipt of the application and that the application was administratively complete. By a letter dated February 28, 2014, Vermont ANR informed Morrisville that the application was technically complete, requested additional information to be provided within 30 days and *noted that the application could be denied without prejudice* if the information is not provided. JA __.

Commencing with the filing of the 2014 application, Morrisville and Vermont engaged in an active exchange of positions, requests for information, submission of assessments, proposals and review thereof. For example, in June 2014, Morrisville proposed revised mitigation flow measures, as well as a phased-in approach to

implementing the water quality conditions contained in Vermont ANR's December 2013 preliminary terms and conditions. JA __.

### A. First Reset of the One-Year Limitation Period: November 7, 2014

Of note is a series of email messages exchanged on October 29, 2014. *See* Perry Memorandums (JA__ and __). This email exchange was one of several email messages threads and telephone calls that occurred in late October and early November, 2014. Mr. Meddie Perry was Morrisville's environmental scientist. According to him:

- On October 29, 2014, Shap Smith … spoke with Craig Myotte … and stated he talked with Justin Johnson … and Liz Miller[,] In the October 29, 2014 call, Mr. Smith related to Mr. Myotte the suggestion of Mr. Johnson and Ms. Miller that MWL [Morrisville Water and Light] should withdraw its 2014 Water Quality Certification application and resubmit it in order to give the parties more time to solve their issues.

- Mr. Myotte informed me of these discussions via emails and phone calls on October 29 and 30, 2014. According to representative Smith, Deputy Secretary Johnson commented that if Morrisville withdraws and then re-applies there is no guarantee that a 401 WQC would be more favorable than Vermont ANR's current stance, *but if MWL does not withdraw the WQC would definitely be unfavorable.* (emphasis in original).

- On November 3, 2014, John Groveman (then Vermont General Counsel, currently attorney for VNRC and Trout Unlimited in the MWL state court litigation) spoke with Jeff Nelson … and discussed Vermont ANR's suggestion to withdraw the 2014

15

WQC application. Mr. Groveman said to withdraw and refile immediately. Mr. Nelson discussed this call with me on November 3, 2014 and told me that *Mr. Groveman strongly stated that withdrawal will be a better deal for MWL than staying the course. I relayed the summary of this discussion to MWL.* (emphasis in original)

Approximately one week later, Morrisville, by a letter dated November 7, 2014, emailed Vermont ANR and withdrew and resubmitted its application for certification. JA __.  Two and a half months were remaining before the one-year period for the January 30, 2014 application would have expired. A period of time in which Vermont ANR would have to issue a draft certification ("Tentative Determination")[16], issue public notice, afford a minimum of 30 days for comment, convene a public hearing-comment period before issuing a final certificate on or before January 30, 2015[17]; constituting a procedural inability. Instead, Vermont ANR continued with its efforts and those of Morrisville to assess the Project's operation as provided in the 2013 relicense application, *an application that had not changed* since its filing on the January 2014 Vermont ANR.

---

[16] VT ANR 2014 *Section 401 Water Quality Certification Practice*, VII.(1). Addendum __.

[17] *Id.* IX. Addendum __. The VT ANR  Secretary shall provide a "period of not less than thirty (30) days following the date of the public notice."  Section 13.3(c)(2) of the Vermont Water Pollution Control Permit Regulations (VWPCPR). Addendum __. Section 13.3  -A agency Processing of Completed Applications. Addendum __.

16

The Morrisville November 7, 2024 letter to Vermont ANR was not filed with the Commission. Upon receipt of the Morrisville letter, Vermont ANR on that same day sent a letter to Morrisville acknowledging the reset, *i.e.,* the withdraw and resubmission of the certification application, and also filed its November 7, 2014 acknowledgement letter with the Commission. JA __. Vermont ANR in its letter thanked Morrisville "for your cooperation" and acknowledged that the withdrawal and reapplication had occurred "concurrently." JA. __.

Morrisville did not inform the Commission of the reset submission despite the requirements of 18 C.F.R. § 5.23(b)(1)(ii) requiring an applicant to submit with the Commission "a copy of the request for certification, including proof of the date on which the certifying agency received the request."

Morrisville's November 7, 2014 letter did not include an executed copy of Vermont ANRs two page application form. JA__. The November 7, 2014 letter alone served as the resubmitted certification application.

Morrisville stated in its November 7, 2014 letter that "[t]o accommodate VTANR review of Morrisville's various proposals, including its recently submitted phase-in proposal, and in consideration of other factors that have arisen in discussions with the VTANR over the course of the past year, Morrisville hereby withdraws its January 30, 2014 application and simultaneously reapplies for Section 401 water quality certification in the FERC relicense for project No 2629." JA __.

17

As noted in the Morrisville November 7, 2014 letter, "resetting" the one year time period was discussed with Vermont ANR as early as, if not earlier than, October 2014. JA___ (Request for Rehearing), JA___(December 2020 Perry Memorandum). As noted in the Perry memorandum, the 2014 reset was proposed initially by Vermont ANR and was done with the involvement of the Vermont Governor's Chief of Staff. JA __. Despite the coercion to reset the one-year period or be presented with harsher terms, Vermont ANR and Morrisville continued their exchange of information, studies, positions, etc. See, for example, the exchange of email messages between Leslie Welts, Vermont ANR and Craig Myotte, Morrisville.  JA __, JA __ (threat).

**B.**    **Second Reset of the One Year Limitation Period: September 9, 2015**

One month before the second reset of September 9, 2015,  Vermont ANR, on August 15, 2015, released for review and comment to Morrisville and stakeholders, its report "Green River Reservoir Littoral Habitat Assessment," which provided an analysis related to the forthcoming water-level and drawdown conditions in the WQC for the Green River development impoundment (reservoir).  Perry December 2020 Memorandum, JA __. Again, in the remaining month, Vermont ANR would have issued a draft certificate, notice thereof, solicited public comment, etc., all before issuing or denying a certificate. *See* Section 3 of VWPCPR (Vermont Water Pollution Control Permit Regulations), Addendum __.

18

On August 26, 2015, a meeting was held that included Morrisville's manager at the time, Craig Myotte, Trey Martin (then Vermont ANR Deputy Secretary) and staff from the Department of Public Service. The essence of this meeting was captured in a subsequent email message from Mr. Myotte to Mr. Martin JA __.

> Given all that was discussed yesterday … I am concerned about the impending deadline for Vermont ANR to issue a draft certification. I would truly like to explore the options we discussed[.] … For this reason, *I want to inquire whether Vermont ANR would be willing to support a further extension - by way of withdrawing and resubmitting the WQC application?* (emphasis in original)

The question of whether "Vermont ANR would be willing to support a further extension" foreshadowed a period of negotiation between Vermont ANR and Morrisville regarding the terms *and conditions required by Vermont ANR as a condition precedent to supporting and agreeing to* Morrisville's plan to withdraw and resubmit its WQC application, i.e., the first "reset." Vermont ANR's terms and conditions were listed in an August 28, 2015 email message from Craig Myotte (General Manager, MWL) to its attorney, Elijah Emerson (Attorney, Primmer Piper Eggleston & Cramer PC):

> I talked with Trey Martin [Deputy Secretary, Vermont Agency of Natural Resources] this morning regarding the email that I sent him yesterday. Trey stated that the Vermont ANR could support the withdrawal and reapplication under the following conditions:
>
> 1. MW&L accepts the Vermont ANR's bypass flow levels at Morrisville and Cadys Falls and agrees not to contest or seek

legislative changes. They need this agreement in the next couple of weeks.

2. A firm timeline needs to be set for completing the tasks outlined in my Aug. 27 email to Trey. Trey is looking at an extension through April of 2016 not necessarily another 12 months.

JA___ and ___ (2015-08-28 Email from Craig Myotte to Elijah

Emerson (July and December Perry Memorandums, Attachment 4).

Shortly thereafter, on September 3, 2015, Mr. Myotte sent an email to Mr.

Martin responding to Vermont ANR's terms and conditions:

The purpose of this email is to follow-up on the discussion we had last week regarding Morrisville's withdrawal and reapplying its WQC application.

***In our discussion last week, you stated the Vermont ANR would have a couple of conditions in supporting a second withdrawal and reapplication. These conditions are summarized below***.

I. Morrisville would agree with the bypass flows recommended by the Vermont ANR and not seek legislative change or challenge the bypass flow recommendations in Environmental Court.

2. The time extension resulting from the withdrawal/reapplying would be limited to a shorter time period of3 to 6 months.

Morrisville cannot agree to the Vermont ANR's first condition and Morrisville asks the Vermont ANR to consider supporting deferring the issuance of a draft WQC for about 4 months until the end of 2015 (December 31,2015).

JA___ and __ (2015-09-03 Email string (3 September 2015) Craig Myotte, Trey Martin, July and December 2020 Perry Memorandums, Attachment 5).

Mr. Martin responded to Mr. Myotte the following day, September 4, 2015:

Thank you for your email and continued effort to work towards a resolution of the outstanding issues between Vermont ANR and Morrisville Water & Light (MWL) before issuance of the 401 Water Quality Certification. We have considered your request below to delay issuance of the 401 WQC to December 31, 2015, and I am happy to let you know that *Vermont ANR will support this extension in order to continue working with you and your team* on the conditions for the Green River Reservoir facility. However, we will not be able to support any further extensions beyond December 31, 2015.

JA___ and __. (emphasis added) (2015-09-08 Email string (3-8 September 2015) Craig Myotte, July and December 2020 Perry Memorandums, Attachment 6).

Discussions between Vermont ANR and Morrisville continued. On September 9, 2015, Jeff Crocker (River Ecologist, Watershed Management Division, Vermont Department of Environmental Conservation) sent an email to Mr. Myotte telling him what documentation Vermont ANR was going to need and when that documentation needed to be submitted:

Following up on my voicemail from this morning. The Agency will need a letter from Morrisville Water and Light by the close of business today (Wednesday) if Morrisville Water and Light wishes to withdraw its November 7, 2014 application and simultaneously reapply for a Section 401 water quality certification. I have attached your letter last year as a template.

JA___ (2015-09-09 Email string (9 September 2015) Craig Myotte, Perry July and December 2020 Perry Memorandums, Attachment 7),

21

On September 9, 2015, in a letter emailed to Vermont ANR, Morrisville submitted its "Withdrawal and Reapplication." JA ___. Later that day, Vermont ANR acknowledged receipt of Morrisville's September 9, 2015, letter, noting that "that Morrisville Water and Light is withdrawing its application for a water quality certification for the Morrisville Hydroelectric Project and concurrently is reapplying for a certification." JA___.

Again, the reset was done by a two page letter and not with the requisite Vermont ANR form as required by the 2014 Certification Practice (procedure manual). Addendum __. In concert with Morrisville's request, Vermont ANR also acknowledged receipt of the simultaneous withdrawal and refiling of the application on September 9, 2015, and filed it with the Commission that same day. JA __. Morrisville did not file its September 9, 2015 letter with the Commission.

Within months of the second reset, as noted in the December 2020 Perry Memorandum: on December 18, 2015, Vermont ANR issued a memorandum entitled "Green River Reservoir Littoral Habitat Assessment Proximity analysis and additional transect data." This memorandum referred to the August 2015 report as "the draft Green River Reservoir Littoral Habitat Assessment." The memorandum amended some of the results of the August 2015 report and analyzed new data, stating "*In refining operating recommendation for Green River Reservoir, the Agency has analyzed the macrophyte data collected at the M-transect and D-*

22

*transects, located at 1 m depth and 2 m depth, respectively. This analysis will be*

*included in the revised littoral habitat assessment report."*

(footnotes omitted, italics in original).  JA___ (December 2020 Perry Memorandum,

p. 3).

Despite two resets without Vermont ANR taking any action on the certification application, the Commission did nothing. It did not inquire as to whether progress was being made with regard to the certification; it did not ask whether the resets should be treated as dismissals (with or without prejudice); it did not correspond with Vermont ANR and/or Morrisville concerning certification, due diligence, etc.

### C.    Final Environmental Assessment: December 15, 2014

In the time between the two resets, the Commission did issue a final environmental assessment on December 15, 2014. JA __.[18] Thus, the Commission, without a draft or final water quality certificate, was able to complete its assessment of the application for relicensing, which includes assessments on water quality, habitat, etc., less than two months after the first reset of November 7, 2014, and well before the second reset of September 9, 2015.

---

[18] The Commission had issued a draft environmental assessment on June 20, 2014.

### D.    2016 Water Quality Certificate Issued: August 9, 2016

On August 9, 2016, a month before the third one-year period would have expired, Vermont ANR issued a water quality certification. JA __. (notice of certification appeal filed with Commission). Morrisville appealed the water quality certificate to the Vermont Superior Court, Environmental Division, on September 13, 2016, and to the Vermont Supreme Court on October 18, 2018. On November 22, 2019, the Vermont Supreme Court affirmed in part, and reversed and remanded in part, regarding the conditions imposed by Vermont ANR's water quality certification. The Vermont Superior Court, Environmental Division issued a decision on the merits following remand on August 26, 2020. By letter dated September 4, 2020, Vermont ANR submitted to the Commission "Final conditions of Water Quality Certification," which reflected the current conditions upon close of court proceedings. JA __.

One of the 2016 certification requirements, which would be a mandatory condition in a license if issued by the Commission,[19] involved a significant dam

---

[19] In response to the 2016 certification's requirements for maintenance of a higher impoundment for the Green River's development level during winter months, the Commission requested a safety analysis of the Green River dam including (i) a hydraulic and hydrology analysis and (ii) a stability analysis. This information, held in abeyance pending the state court proceedings, is still pending. Until it is furnished, the Commission cannot complete its assessment of the proposed project for licensing. Failure to supply it could result in the Commission's dismissal of the application. *See, e.g., Goose River Hydro, Inc.*, Project No. 2804-037, Order Terminating License by Implied Surrender, 183 FERC ¶62,044 (2023).

safety issue that the Commission must resolve before it may make a determination on the 2013 application; whether or not to issue a new license.

**E.     The Commission's CWA §401(a)(1) Waiver Determination: November 20, 2020**

While state court proceedings were ongoing, on January 25, 2019, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) issued an opinion in *Hoopa Valley Tribe v. FERC*, ruling that, where a state and an applicant agree to repeatedly withdraw and refile the same water quality certification request, the state has waived its Clean Water Act certification authority.

On May 28, 2020, Morrisville filed its Petition for Declaratory Order Regarding Waiver of Water Quality Certification Requirement with the Commission. JA.__. The Commission issued public notice of Morrisville's petition on June 1, 2020, and established July 1, 2020, as the deadline for filing comments.

In response, Vermont ANR and other commentators argued that the Commission should not find that Vermont ANR had waived its certification authority because (i) waiver would be inconsistent with the CWA, (ii) *Hoopa Valley* was inapplicable, (iii) *Hoopa Valley* could not be applied retroactively, (iv) Morrisville lacked standing, (v) Morrisville had unclean hands and (vi) the doctrine of laches precluded Morrisville's relief.  JA___, JA___. Vermont ANR's response,

25

filed on July 1, 2020, included thirty-six (36) attachments, in total six hundred and sixty pages (660).

On July 27, 2020, Morrisville filed a response with an affirmed statement, *i.e.,* the July 2020 memorandum from Morrisville's environmental consultant, Meddie Perry, summarizing the agreement with and coordination between Morrisville and Vermont ANR to withdraw and resubmit Morrisville's §401 Water Quality Certification application. July Perry memorandum, JA ___.

The July Perry memorandum included seven attachments. Attachment 3 provided notes of a November 3, 2014 conversation between a Morrisville environmental consultant with Vermont ANR's General Counsel (John Groveman). Stopping the clock was discussed with withdrawing being a better deal for Morrisville than staying the course. Vermont ANR would work with Morrisville on wording of the withdrawal. JA __.

Attachment 5 is a September 3, 2015 email from Morrisville to  Vermont ANR's Deputy Secretary, Trey Martin. The email's subject line states " **Request to Extend [one-year period] to 12/31/2015 for issuance of WQC for Morrisville Hydro."** In the email, Morrisville informed Vermont ANR that it would agree to several Vermont ANR certificate conditions "supporting a second withdraw and reapplication. JA __.

Attachment 7 included a September 9, 2015, email from Vermont ANR to Morrisville that followed upon on a voicemail message from Vermont ANR to Morrisville on the morning of September 9, 2015 that the agency would need Morrisville's letter resetting the one-year period "by the close of business today (Wednesday) [September 9, 2015] if Morrisville Water and Light wishes to withdraw its November 7, 2014 application and simultaneously reapply for a Section 401 water quality certification." JA __. Why the deadline of September 9, two months before the expiration of second reset one-year period, was not discussed.

Morrisville asserted that the interactions described by Mr. Perry, along with the concurrent withdrawal and resubmission of Morrisville's certification application *and **Vermont ANR's same day** acknowledgement and with Vermont ANR filing its letter with the Commission, showed an ongoing pattern of cooperation and coordination between Morrisville and Vermont ANR for over at least two years*.

Vermont ANR filed a response to Morrisville's July 27, 2020 filing, arguing that the correspondence only shows an effort to resolve disagreements and give Morrisville time to submit additional information, and is not evidence of coordination. Declaratory Order, 173 FERC ¶61,156, P 11, JA __.

On November 19, 2020, the Commission issued a Declaratory Order on Waiver of Water Quality Certification, JA__. concluding that "Vermont ANR's actions do not provide a sufficient basis to find that it waived its authority to issue a

certification under the CWA." JA __. (citation omitted). In support of this conclusion, the Commission found that **_Morrisville had acted unilaterally_**. Specifically, "the record does not reflect that Morrisville had a functional agreement with Vermont ANR to coordinate withdrawal and refiling for the purpose of providing the state more time to act on Morrisville's application." JA__.

The Commission went on to note that "where the licensee withdraws and refiles its application in order to avoid potentially unfavorable water quality certification conditions, the licensee acts unilaterally for its own benefit and by its own initiative, which is not a sufficient basis to find waiver" JA__. (footnote omitted).

The Commission acknowledged that the "Vermont ANR may have provided Morrisville information as to how and when to withdraw and resubmit its application" but did not find that "this correspondence reflects that Vermont ANR sought withdrawal and resubmittal to circumvent the one-year statutory deadline for the state agency to act." JA__. (footnotes omitted). Vermont ANR's need for more time to act, though noted in the "this correspondence," was not addressed by the Commission's order.

Finally, on the issue of the extent to which the Petitioner's application had changed with each resubmission, the Commission determined that where an applicant "voluntarily delays the issuance of a water quality certificate by

28

withdrawing and refiling its application, absent an agreement with the state, then waiver is not warranted, *regardless of whether or to what extent the refiled application changes from the original*." JA__. (emphasis added).

On December 21, 2020, Morrisville filed a Request for Rehearing. JA__. This request raised three issues (JA__):

1. Whether the Commission erred in not finding that Vermont ANR had waived its authority to issue a Water Quality Certificate under §401 of the CWA *by its conduct,* considered jointly or separately.

2. Whether the Commission erred in holding that Morrisville had acted unilaterally for its benefit solely and ignoring, at a minimum, the certifying agency's participation in resetting the one-year period twice before issuing a certificate; especially when the agency at any time could have denied the application(s) before it.

3. Whether the Commission should have determined whether new and different applications had been "resubmitted" by Morrisville and accepted by Vermont ANR in resetting the multiple one-year periods.

The Morrisville rehearing request included the December 18, 2020 memorandum from Mr. Perry refuting the Commission's determination that (1) there was no functional agreement between Vermont ANR and Morrisville; and (2) that the additional time afforded by the resets was for the unilateral benefit of Morrisville. JA __. The memorandum was affirmed: "I make this statement with the knowledge that Title 18, U.S.C. 1001 makes it a crime for any person knowingly and willingly to make to any Agency or Department of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction." December Perry

memorandum, JA __. The December Perry Memorandum, attached to the Rehearing

Request, included the same seven attachments that were provided in the July Perry

Memorandum filed on July 27, 2020. JA __.

The Petitioner's Request for Rehearing was denied by operation of law on

January 21, 2021. JA__. Morrisville filed a timely Petition for Review with this court

on January 25, 2021.  JA__.

On February 24, 2021, the Commission issued an Order Addressing

Arguments Raised on Rehearing. JA__. On the question of the applicability of

*Hoopa Valley* to these proceedings, the Commission concluded:

> [T]he court in *Hoopa Valley* considered the *motivations* of the licensee
> and especially of the certifying agencies, as indicated by their
> communications and conduct, as material facts bearing on the question
> whether the states waived their section 401 authority. Accordingly, in
> the Declaratory Order, the Commission appropriately considered
> similar types of evidence regarding Morrisville and Vermont ANR,
> such as the contents of email correspondence, in determining that no
> waiver occurred.

> Rehearing Order, JA__ (internal footnotes omitted, emphasis added).

With regard to the conduct of Vermont ANR, the Commission concluded

that the "mere acceptance of Morrisville's requests to withdraw and refile is not

evidence of a functional agreement between the parties with the motivation to

restart the one-year clock." JA__ (footnote omitted).  This might have been true if

all that Vermont ANR did was to accept Morrisville's withdrawals and

30

reapplications.  However, as discussed herein, this is clearly ***not*** all that Vermont ANR did (and did not) do.

With regard to the question of whether Vermont ANR's conduct resulted in a waiver of its §401(a)(1) authority, the Commission concluded that "Vermont ANR's conduct does not justify a conclusion of waiver. … [T]here must be evidence of 'deliberate … idleness' [*Hoopa Valley*] by the state to defy the requirement of section 401 of the CWA that the state act within a reasonable period of time." JA__.

With regard to the question of whether Morrisville acted unilaterally, the Commission did not accept Morrisville's contention that there was a functional agreement between Morrisville and Vermont ANR: "We continue to find that 'nothing in the record leads us to conclude that Morrisville's withdrawal and resubmittal was made at the behest of the state certifying agency to delay a certification decision.'" JA__.

Finally, with regard to the significance of whether the resubmitted applications were materially different from the applications that had been withdrawn, the Commission determined that "this alone is not dispositive in determining whether there is waiver."  JA__. The Commission concluded: "We continue to find that if an applicant voluntarily delayed the issuance of a water quality certificate by withdrawing and refiling its application, absent an agreement

with the state, then finding waiver would not be warranted, even if there were not a new application." JA__.

The merits of the Perry memorandums filed on July 27, 2020 (JA __.), and , December 18, 2020, though affirmed, were ignored by the Commission.

## SUMMARY OF THE ARGUMENT

The record before the Commission unequivocally supports by substantial evidence that Morrisville did not act unilaterally and solely for its own benefit. Vermont ANR did more than suggest or aide Morrisville in resting the one-year period twice; it negotiated agreement to several certificate conditions, and it threatened Morrisville with the possibility of harsher conditions. Most of all, Vermont ANR needed more time to adhere to its own procedures for the noticing and issuance of a draft certificate, convening a public meeting (hearing), evaluating comments, etc. before issuing a determination on the merits of the application, *i.e.* taking action in accordance with Section 401(a)(1) by issuing a certificate, denying a certificate, or waiving its certification authority. The pressure applied to Morrisville from Vermont ANR to rescind and reapply was, in part, an attempt by the agency to extend their time for review and certification. This capricious reasoning was not disclosed to the applicant.

Under §401(a)(1), it is the responsibility of the certifying agency to act on an application within one year by either granting certification (with or without conditions), denying certification (with or without prejudice), or waiving its certification authority. When a certifying agency fails to act on an application within one year, waiver occurs by operation of law. The Commission must then declare the waiver and allow the licensing process to proceed.

33

Contrary to the Commission's rulings,  Vermont ANR waived its certification authority by failing to act within one year of receiving the Petitioner's certification application. The Commission's conclusions to the contrary are both factually and legally incorrect.

The Commission's focus on motives, whether those of an applicant and/or a certification agency, misses the mark and frustrates Congressional intent to avoid unreasonable delays to the licensing process due to the certification process. If motive is relevant, then that of Vermont ANR needs equal consideration.

Consequently, the decision of the Commission should be set aside, and this proceeding remanded to the Commission with direction to enter an Order concluding that Vermont ANR waived its CWA certification authority by failing to act within a reasonable period of time not to exceed one year after receiving the Petitioner's certification application.

## ARGUMENT

### I.    The Commission's Waiver Determination Violated §401(a)(1) Of The CWA

#### A.    The Commission's Waiver Determination Violated The Plain Language Of  §401(a)(1)

The intent of Congress to avoid delays is clear: "If the State … fails or refuses to act on a request for certification, within a reasonable period of time (*which shall*

*not exceed one year*) *after receipt of such request*, the certification requirements of this subsection shall be waived with respect to such Federal application." 33 U.S.C. §1341(a)(1) (emphasis added). An established rule of statutory construction holds that deadlines contained in a statute are to be strictly construed. This rule was applied in *New York II* where the Commission concluded that a state denial of certification "came too late because, in violation of Section 401, it occurred more than one year after the DEC received National Fuel's application." 991 F.3d at 442 The Second Circuit Court of Appeals affirmed:

> These orders determined that the DEC *waived its water quality certification authority* under Section 401 of the Clean Water Act *by failing to act within one year of receiving a certification request*. … We conclude that Section 401's one-year time limit may not be extended by the type of agreement between a certifying agency and an applicant used here and, therefore, FERC properly concluded that the DEC waived its certification authority.

> 991 F.3d at 442 (emphasis added).

The Commission's orders violate the clear mandate of section 401 .

### B. The Commission's Interpretation of §401(a)(1) Is Inconsistent With The CWA's Purpose And Legislative History

The Commission's Declaratory Order misinterprets the Clean Water Act, specifically §401(a)(1) by its failure to adhere to the one-year limitation upon state review of a certification application – action upon a request shall not exceed one year after receipt of a request.

The intent of Congress is stated unequivocally: State agencies reviewing water quality certification requests have a maximum of one year following receipt of a request for certification to act on the request. The Commission cannot change this requirement as the "reasonable period of time" is set by statute. Upon receipt of a request for water quality certification, a state certifying authority has three options: (i) issue the certification (with or without conditions), (ii) deny the certification (with or without prejudice) or (iii) waive its certification authority. If an agency does nothing within a reasonable period of time not to exceed one year, the statute is explicit and clear – a waiver has occurred. Irrespective of what action an agency intends, it must be completed within one year following receipt of a request for water quality certification. If not, state authority to issue such a certification is waived. That is precisely the situation that Morrisville has confronted.

The Commission's Orders addressing motive of an applicant, whether acting unilaterally or in concert with a certifying agency, is an interpretation at odds with the CWA's requirement that a certifying agency must act within a reasonable period of time not to exceed one year. The focus should be upon the actions of certifying agency, which is obligated to act under Section 401(a)(1). Exactly, the course followed by the Commission in a February 15, 2024 order addressing waiver by a certifying agency, wherein the Commission held that "Speculation regarding motive is immaterial to the Commission's factual analysis of the California Board's actions

36

to determine whether it actually waived its water certification authority." *Pacific Gas and Electric Company and Nevada Irrigation District*, Order Addressing Arguments Raised On Rehearing And Addressing Supplemental Petition For Declaratory Order On Waiver Of Water Quality Certification, 186 FERC 61,121 at P 24 (2024)(emphasis added).

## II.    The Commission's Findings Are Unsupported By Substantial Evidence

### A.    The Commission Erred When It Found That The Village Of Morrisville Acted Unilaterally In Withdrawing And Resubmitting Its Water Quality Certification Application

The Commission determined that "Morrisville acted unilaterally and in its own interest, and nothing in the record leads us to conclude that Morrisville's withdrawal and resubmittal was made at the behest of the state certifying agency to delay."

Contrary to the Commission's Orders, there is substantial evidence that multiple political actors throughout Vermont state government were actively complicit in the withdrawal/resubmission reset(s) scheme. For Vermont, the gamut ran from Vermont ANR's Deputy Secretary and General Counsel to the Governor's Chief of Staff, July and December Perry Memorandums, JA __ and JA __. The July and December 2020 Perry memorandums, both affirmed under penalty of law, document that the initial suggestion for a reset of the one-year period came from Liz Miller (Governor Peter Shumlin's Chief of Staff). Ms. Miller's suggestion was

related to Morrisville by Shap Smith, a Representative from Morrisville to the Vermont State House of Representatives. JA __ and JA __.

Implementation of Ms. Miller's suggestion required close cooperation between Morrisville and Vermont ANR, resulting in the November 7, 2014 "application" (JA _) being received, processed for technical completeness, etc.; and acknowledged by Vermont ANR's letter of the same date (JA __), which was filed by Vermont ANR with the Commission (JA __) though Morrisville should have informed the Commission of the reset consistent with Commission regulations regarding dismissal of certificate requests and/or the filing of request *See*, 18 C.F.R. §5.23(b)(1)(ii).

### B. The Commission Erred When It Found That Vermont ANR Was Not Complicit In The Withdraw-And-Resubmit Scheme

The Commission noted that "[i]n prior cases where we have found that the state agency functionally agreed to a withdrawal and refiling scheme, the state agency either requested or directed it with the motivation to restart the one-year clock." JA __, (Declaratory Order, P 21, footnote omitted). This is precisely what occurred. The Governor's Chief of Staff and a member of the Vermont House of Representatives as well as Vermont ANR staff were all complicit in the withdrawal/resubmission scheme (Perry Memorandums JA __ and JA __.

38

The record supports that the Vermont Deputy Director and the Governor's Chief of Staff wanted additional time to resolve issues, studies, etc. and could not do so before the initial and second one-year periods would have expired on January 30, 2015, and November 7, 2015, respectively. Perry July and December Memorandums, JA __ and JA __; *see, also* JA __, Vermont ANR July 29, 2014 discussing "flows and water management plan"; JA __, Vermont ANR September 23, 2014 email discussing arrangements for an October 2, 2014 meeting "to discuss bypass proposals"; JA __, Morrisville November 7, 2014 reset letter: "To accommodate [Vermont ANR] review of Morrisville's various proposals, including its recently submitted phase-in proposal, *and in consideration of other factors that have arisen in discussions with the [Vermont ANR] over the course of the past year*, Morrisville hereby withdraws its January 30, 2014, application and simultaneously reapplies for Section 401 water quality certification in the FERC relicense for project No 2629" (emphasis added).

Vermont ANR not only agreed to a withdrawal and refiling scheme, but it also initiated it; *and it needed more time in order to complete the state's water quality certification process*. This process was not completed until 2016 with the circulation of a draft certificate (the only one issued), issuance of the requisite public notice (the only one issued), the convening of the only public comment period that closed in July 2016, and finally issuance of the August 16, 2016 certificate.

39

The Commission did not consider why Vermont ANR sought or even needed "to restart the one-year clock" in November 2014 and September 2015. Instead, it myopically focused upon what it perceived to be the only motivation for the resets; that of Morrisville; and in doing so, ignores the failure of Vermont ANR to take any one of the requisite actions upon an application either required or permitted under the CWA. 33 U.S.C. § 1341(a)(1).

Moreover, contrary to the Commission's "unilateral benefit" conclusion, both Vermont ANR and Morrisville engaged in good faith efforts to exchange additional studies conducted by both of them, and to consider alternatives to the Vermont ANR's initial terms and conditions (2013), draft water quality certificate (2016), and public hearing (2016) through issuance of the August 9, 2016 certificate. If there was no benefit to Vermont ANR, why did it wait? Why did it not dismiss the application with or without prejudice? Why did it undertake its own studies (*e.g.,* littoral habitat, JA ___.)? Vermont ANR benefited and chose to actively participate. Look at the timing involved in the November 7, 2014 and September 9, 2015 reset letters and Vermont ANR's acknowledgment letters. Clearly the state was intent on avoiding an inadvertent waiver which, as noted above, had occurred in *Central Vermont.*

Vermont ANR controls the certification process. The January 30, 2013 certification application was declared administratively complete on February 3,

2013. On February 28, 2013 Vermont ANR found the application to be technically incomplete and requested additional information, and informed Morrisville that the certification application could be denied at any time without prejudice if additional information were not provided (within 30 days). JA __.

At any time subsequent thereto, Vermont ANR could have acted upon the January 30, 2014 application; particularly because Vermont ANR, on December 27, 2013, had already filed with the Commission its comments, recommendations and preliminary terms and conditions in response to the Commission's November 5, 2013 "Notice of application accepted for filing, soliciting motions to intervene and protests, ready for environmental analysis, and soliciting comments, recommendations, preliminary terms and conditions." JA __. Vermont ANR continued to refer to those recommendations throughout the ensuing relicensing proceeding and 401 certification process.

In its Request for Rehearing (JA __), Morrisville raised the issue of Vermont ANR's lack of action on Morrisville's certification reset applications. The Commission did not address the issue directly, instead it focused on whether

Morrisville had acted unilaterally. JA __. (Declaratory Order, unilateral action assessment) and JA __. (Order Addressing Arguments Raised on Rehearing).[20]

The Commission previously has determined that even absent evidence of an express agreement, the failure of a certifying agency to act on an application by denying certification within the one year it was afforded under the CWA prior to and upon receipt of each withdrawal (reset), constituted a scheme of resetting the one-year deadline.[21]

In *Turlock Irrigation*, the concern was expressed that a certifying agency "could extend the time for decision indefinitely by denying one certification request after another without prejudice, thus nullifying section 401's one-year limit." The Commission responded stating that the courts "will find repeated denials without prejudice, particularly those that do not rest on any substantive conclusions, to be the equivalent of the withdrawal-and-resubmittal scheme." The argument then

---

[20] This was a departure from precedent as exemplified by *Southern California Edison Co.*, 170 FERC ¶ 61,135 (February 20, 2020), *Pacific Gas and Electric Co.*, 170 FERC ¶ 61,232, at P. 40 (March 19, 2020) and *South Feather Water and Power Agency*, 171 FERC ¶ 61,242, reh'g denied, 172 FERC ¶ 62,101 (2020), decisions in which the Commission found waiver when the certifying agency accepting resubmitted applications rather than exercising the agency's authority to deny the requests.

[21] *See, e.g., Pacific Gas and Electric Company,* Project No. 2105-126, Declaratory Order on Waiver of Water Quality Certification, 172 FERC ¶61,064, PP 31 -34 (2020), reh. denied (by operation of law).

devolved to a question of gamesmanship wherein an applicant could file a certification request "lacking sufficient documentation [that would leave a certifying agency] 'the Hobson's choice of either granting certification [without necessary information] or waiving its power to decide.'" *Turlock Irrigation*, 36 F.4th at 1184 (citations omitted).

Unfortunately, not discussed by the Commission is the importance that the Commission retains its authority to dismiss a license application or hold the licensing proceeding in abeyance should it determine that an applicant is not proceeding diligently with the certification process and delaying the relicensing process in doing so. Also not discussed, is that at some point in the certification process, a certifying agency could reject a certification with prejudice (or without) until the lacking information is provided in a new certification request.

The Commission must act under its licensing authority to preserve the integrity of the processes involved under the FPA and CWA with regard to licensing and certification. The focus of the CWA is upon the certifying agency as the sole actor; an applicant is not required under the CWA to act; it is certainly not authorized to circumvent the one-year period by acting unilaterally or in agreement with a certifying agency. 33 U.S.C. § 1341(a)(1).

**C.    The Commission Erred When It Found That There Was Not A Functional Agreement Between The Vermont Agency of Natural Resources And Morrisville To Coordinate The Withdrawal And Refiling Of Morrisville's Water Quality Certification Application**

The Commission concluded that "the record does not reflect that Morrisville had a functional agreement with Vermont ANR to coordinate withdrawal and refiling for the purpose of providing the state more time to act on Morrisville's application." JA __. (Declaratory Order). Again, the record reflects precisely the opposite. Two days after the September 9, 2015, reset, Vermont ANR in an email dated September 11, 2015, stated:

> As part of the withdrawal and reapplication of Morrisville's application for a 401-water quality certification, the Agency indicated that it would be advantageous to also schedule a series of technical meetings to discuss the Agency's Green River recommendations that were shared with Morrisville on June 9 and the Green River Reservoir Littoral habitat study. Below are proposed dates for the three meetings with **the first being in October**. Please let me know as soon as possible which dates work for Morrisville. JA__.

It is clear that there is substantial evidence supporting the conclusion that Vermont ANR and Morrisville needed additional time to conduct their discussions before and after the second reset of September 9, 2015. Vermont ANR continued to process the application, circulate memos, convene meetings with Morrisville, assess studies, etc., when it could have dismissed the application with or without prejudice and insist that Morrisville file a revised application with the information they allegedly lacked in the initial filing.

44

Vermont's Section 401 Water Quality Certification Procedure (2014) supports Morrisville's position. Under the certification procedure, Vermont ANR must make several specific determinations before it can process an application through issuance of a decision on its merits, *i.e.,* grant or deny certification. First, Section IV requires Vermont ANR, within two weeks of receipt of an application, to determine if an application is administratively complete (an application that has been determined to include all of the initially required documentation necessary to begin a technical review).

Second, Section V requires a determination that the application is technically complete (an application that includes information sufficient to support the creation of a draft decision for public notice purposes). Vermont ANR staff then reviews and analyzes the information and drafting of the certification begins.

After these two determinations are made, Vermont ANR will issue a draft certificate decision for public comment, issue public notice and then convene a public hearing. Only thereafter will Vermont ANR grant or deny (with or without prejudice) a certificate request.

Consider that Vermont ANR's certification procedure requires that an applicant for a FERC license "file a request for WQC on a form provided by the Department" (Certification Procedure III.(d)(1)), provide public notice, hold a public meeting, and provide an opportunity for written comments (Certification Procedure

45

IX). The two resets were submitted to Vermont ANR without the submission of the requisite Certification Procedure's form. When the resets were submitted, less than two months remained on the one-year period(s), an insufficient amount of time to circulate a draft 401 water quality certificate for public comment, issue public notice,[22] hold a public meeting, receive written comments, respond to them, and issue a decision on the application's merits.

Vermont ANR noticed its only tentative decision and draft water quality certification (draft 401 certificate) from January 7, 2016 through February 19, 2016; its only public hearing was conducted on February 16, 2016; and, then it issued on August 9, 2016 a written response to public comments and issued the 401 certificate, one month before the third one-year period would have expired. In all, eight months lapsed from issuance of the requisite public notice through issuance of a certificate. When the November 7, 2014 reset occurred less than three months remained on the first one-year period and when the September 9, 2015 reset occurred less than two months remained. Vermont ANR needed the resets in order to avoid a waiver of Section 401(a)(1).

---

[22] The public notice and hearing requirements are contained in Section 13.11 Vermont Water Pollution Control Permit Regulations dated February 26, 1974. JA__ A minimum of 30 days is required for public comment after publication of the Public Notice.

With regard to the two "resets," Vermont ANR was able to make the prerequisite determinations in less than a day. With regard to the November 7, 2014 reset, the Vermont ANR's November 7, 2024 letter to the Commission acknowledging "that Morrisville Water and Light is withdrawing its application for a water quality certification" was sent at 2:16 pm on the same day that Vermont ANR received Morrisville's reapplication. The same series of events were repeated regarding the September 9, 2015 reset, when Vermont ANR's letter to the Commission was sent at 4:01 pm on the same day that Vermont ANR received Morrisville's reapplication. JA __, JA __, JA __, and JA __.

Vermont ANR is a large state agency, whose own regulations governing the certification process require reviews among its own departments and with other state agencies. How could it have acted so quickly and decisively in a matter of hours with regard to each reset? Practice and repetition are not the sole answer. The answer is that (1) *the reset applications were unchanged* and (2) that withdrawing and resubmitting the applications was coordinated with Vermont ANR because both sides benefited therefrom.

Furthermore, Vermont ANR continued to work on its own studies of the Green River Reservoir drawdown well into December 2015. Vermont ANR did not issue a draft certificate for public comment until January 7, 2016, convened a public

hearing on February 16, 2016, and held the public record open until April 29, 2016. Rehearing Request, JA __ and JA __.

The Perry memorandums of July 24, 2020, and December 20, 2020 (JA __ and JA __) unequivocally support, by substantial evidence, a finding that Morrisville was not acting alone. Morrisville's motive in participating with Vermont ANR in the withdraw and resubmit schemes as a means to extend Vermont ANR's time to act is irrelevant.[23] The relevant and requisite focus required by the CWA is whether Vermont ANR acted (or did not act) on the application within a reasonable period of time. Vermont ANR could have acted on Morrisville's applications at any time. Morrisville did not act unilaterally; Vermont ANR was complicit regardless of who initiated the resets.

### D. The Commission Erred In Its Determination That It Was Not Necessary To Determine Whether The Water Quality Certification Applications As Withdrawn And Resubmitted Differed

The Commission concluded that "Morrisville by its own initiative withdrew and refiled the applications to obtain more favorable conditions and give itself more

---

[23] Attachment 1 to the July and December Perry Memorandums (JA __- and JA __) is the following statement from Mr. Perry to a college regarding the desirability of a reset:

> Seems to me that doing **this would help [Vermont] ANR by buying the agency more time to sort out its failure to follow its own procedures internally** before the 1-year deadline for waiving a 401 crops up in January [2015]. (emphasis added).

time to consider various studies and alternatives, so we need not consider the extent to which the various applications differed." Declaratory Order, JA__. The Commission's rationale sidesteps the issue of Vermont ANR's own efforts, especially before and during the two reset periods, to reach a consensus with Morrisville regarding conditions for inclusion in a water quality certificate. Request for Rehearing, JA __ - __. Moreover, the Commission should not have sidestepped the issue of whether the resubmitted application was materially different to warrant a finding that the reset applications were new certification requests standing on their own merits – despite being resubmitted without the requisite agency application forms. It declined to do so, because a finding that the applications were not different would have highlighted its failure to focus upon Vermont ANR's failure to act.

Morrisville did not withdraw and refile certification requests "by its own initiative." Morrisville was encouraged to do so, including being threatened with an adverse outcome if its certification request was *not* withdrawn and resubmitted. *See* Perry memorandum dated July 24, 2020 (JA __) and Perry memorandum dated December 18, 2020 (JA __).

In order to determine whether the withdrawal and resubmittal of Morrisville's applications was a ruse to avoid the one-year limitation period or actually reflected substantive changes in the project, the Commission should have considered the extent to which the various applications differed. The extent to which changes in a

49

project were reflected in resubmitted applications is a critical factor to be addressed by the Commission when determining if a withdrawal and resubmission scheme was intended to circumvent the one-year limitation period of §401(a)(1). Instead, the Commission refused to do so by focusing upon Morrisville's desire to avoid onerous terms and condition that would interfere with its responsibilities as a municipal electric utility to provide to its ratepayers reliable and low-cost service; but, in doing so failed to assess Vermont ANR's own motives and its need for the additional time afforded by each reset just to adhere to its own procedure for processing a certification request, *e.g.,* issuance of a draft certificate, public notice soliciting comments, responses to comment and finally action upon the application – grant, deny or waive consistent with Section 401(a)(1). 33 U.S.C. §1341(a)(1).

It strikes a discordant note for the Commission on one hand to declare that a certifying agency's motive or excuse for not acting upon an application is irrelevant and then use an applicant's possible motive for engaging in multiple rests of the one-year period as justification for not addressing the Vermont ANR's failure to act within a reasonable period. If the Commission had made the requisite inquiry into whether the applications were substantially the same, they would have found them to be so which would have led to the conclusion that the one-year period had been circumvented.

In contrast, when a certifying agency dismisses an application *with prejudice*, an applicant cannot simply turn around and resubmit the same application. The proposed project has to be altered, deficient information provided, etc., changing the application sufficiently so the certify agency may justify its acceptance and subsequent processing. This did not occur with the November 7, 2014 or the September 9, 2015 resubmitted applications.

# CONCLUSION

A critical issue throughout these proceedings has been the relationship between Morrisville and Vermont ANR. While this may seem to be a self-evident statement, there is one aspect that colors the relationship: Vermont ANR has extensive experience and expertise regarding every issue related to hydropower licensing under the Federal Power Act and more so with the issuance of water quality certifications under the Clean Water Act. Morrisville, with a single hydroelectric project, has had little exposure to the statutory and regulatory requirements for relicensing under the FPA and CWA.

Vermont ANR's conduct should be the sole analytical fulcrum. Vermont ANR should have denied the Morrisville application(s) without prejudice subject to future refiling after the completion of studies or the provisions of additional information, discussions, etc. *See, e.g.,* September 11, 2015, email from Vermont ANR providing follow up meetings two days after the September 9, 2015 reset. JA __.

Vermont ANR should have acted on the application(s) as required by the CWA. 33 U.S.C. §1341(a)(1). Vermont ANR should not have participated at any level in a withdraw-and-resubmit scheme; even if all it did was to inform or assist Morrisville in the consideration of resetting the one-year period.

But Vermont ANR did more. It needed more time to follow its processes before it could act upon a certification application. It negotiated the inclusion of two

52

certificate conditions as part of the second reset. It assumed the responsibilities of Morrisville as a license applicant to inform the Commission of the resets with its acknowledgement letters of November 7, 2014 and September 9, 2015. JA __ and JA __. While there is much that Vermont ANR could have done to achieve the goals of both the Federal Power Act and the Clean Water Act to process license and certification applications in a timely manner, it did not act upon the application with a reasonable period of time not to exceed one year.

The Commission's assessment of Morrisville's motivation is not relevant to the inquiry of whether Vermont ANR acted within a reasonable period of time. The suggestion that a certification applicant can act unilaterally strains credulity and is disingenuous. The record clearly supports the opposite conclusion:

(1)    Vermont ANR's general counsel threatened Morrisville (Perry December and July Memorandums, JA __ and JA __.

(2)    Vermont ANR actively participated by submitting Vermont ANR's acknowledgment letters to the Commission within hours of their receipt. JA __ and JA __.

(3)    Vermont ANR needed more time to complete its own administrative process before issuing a certificate, and it was Vermont ANR that accepted and continued to process the application when it could have dismissed it with or without prejudice. JA __.

The Commission and Vermont ANR acquiesced to the resets; a failure in exercising their respective authorities under the FPA and the CWA to manage the

certification and relicensing proceedings by denying the certification application and/or staying or dismissing the license application.

The Commission's Declaratory Order on Waiver of Water Quality Certification in *Village of Morrisville*, 173 FERC ¶61,156, (November 19, 2020) is factually and legally incorrect. The Declaratory Order should be vacated and remanded to the Commission with instructions to enter an Order finding that Vermont ANR had waived its CWA §401(a)(1) certification authority to review Morrisville's Water Quality Certification application.

The Commission's conclusion that Morrisville withdrew and refiled unilaterally for its own benefit ignores the unambiguous evidence of coordination with and pressure exerted by Vermont ANR. The Commission also erred in finding that the lack of material differences between the applications was irrelevant. Where, as here, the same application is withdrawn and refiled with no substantive changes, it indicates an attempt to circumvent the statutory deadline, not a legitimate reason for restarting the one-year clock.

The Commission's Declaratory Order puts asunder the Congressional mandate, and the public interest served thereby, that requires a certification agency to act upon a certification request within a one-year period; a period that is to be inviolate.

DATED:  March 18, 2024          Respectfully submitted,

/s/ Paul V. Nolan
Paul V. Nolan
5515 17th Street North
Arlington, Virginia 22205-2722
pvnpvndiver@gmail.com
703-587-5896

Carolyn Elefant
LAW OFFICES OF CAROLYN ELEFANT
1440 G Street N.W., Eighth Floor
Washington D.C. 20005
202-297-6100
carolyn@carolynelefant.com

## CERTIFICATE OF COMPLIANCE

1.    This document complies with this Court's type-volume limitation because,

excluding the parts of the document exempted by Fed. R. App. P. 32(f) and

Circuit Rule 32(e)(1), this document contains 11,695 words.

2.    This document complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because

this document has been prepared in a proportionally spaced typeface using

Microsoft Word 365 in 14 point Times New Roman.


 DATED: March 18, 2024          Respectfully submitted,


                               /s/ Paul V. Nolan
                               Paul V. Nolan, Esq.
                               5515 North 17th Street
                               Arlington, VA 22205-2722
                               703-534-5509
                               pvnpvndiver@gmail.com

## CERTIFICATE OF SERVICE

I certify that on March 18, 2024 I caused to be served a copy of the Brief of

Petitioner, Village of Morrisville, Vermont, on Robert Solomon, Solicitor for the

Federal Energy Regulatory Commission, 888 First Street, N.E. Washington D.C.

20426, and all of the parties on the official FERC service list via email.

DATED:   March 18, 2024

Respectfully submitted,

/s/ Paul V. Nolan
Paul V. Nolan
5515 North 17th Street
Arlington, VA 22205-2722
703-534-5509
pvnpvndiver@gmail.com

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

**Page**

Vermont Agency of Natural Resources, Department of Environmental
Conservation, Section 401 Water Quality Certification Practice
(2014)("Procedure Manual") ............................................................. ADD1

Pertinent portion of Section 13.11 of Vermont Water Pollution Control
Permit Regulations ..........................................................................ADD26

G:\COMP\WATER2\FEDERAL WATER POLLUTION CONTROL ACT.XML

# Federal Water Pollution Control Act

[Chapter 758 of the 80th Congress]

[33 U.S.C. 1251 et seq.]

[As Amended Through P.L. 116–337, Enacted January 13, 2021]

⟦Currency: This publication is a compilation of the text of Chapter 758 of the 80th Congress. It was last amended by the public law listed in the As Amended Through note above and below at the bottom of each page of the pdf version and reflects current law through the date of the enactment of the public law listed at https://www.govinfo.gov/app/collection/comps/⟧

⟦Note: While this publication does not represent an official version of any Federal statute, substantial efforts have been made to ensure the accuracy of its contents. The official version of Federal law is found in the United States Statutes at Large and in the United States Code. The legal effect to be given to the Statutes at Large and the United States Code is established by statute (1 U.S.C. 112, 204).⟧

AN ACT To provide for water pollution control activities in the Public Health Service of the Federal Security Agency and in the Federal Works Agency, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## TITLE I—RESEARCH AND RELATED PROGRAMS

### DECLARATION OF GOALS AND POLICY

SEC. 101. (a) The objective of this Act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this Act—

(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

(2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

(4) it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

(5) it is the national policy that areawide treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State;

(6) it is the national policy that a major research and demonstration effort be made to develop technology necessary to

1

ADD1

G:\COMP\WATER2\FEDERAL WATER POLLUTION CONTROL ACT.XML

pollutant loadings within estuarine zones into a set of probable effects on such zones;

(C) a comprehensive water quality sampling program for the continuous monitoring of nutrients, chlorine, acid precipitation dissolved oxygen, and potentially toxic pollutants (including organic chemicals and metals) in estuarine zones, after consultation with interested State, local, interstate, or international agencies and review and analysis of all environmental sampling data presently collected from estuarine zones; and

(D) a program of research to identify the movements of nutrients, sediments and pollutants through estuarine zones and the impact of nutrients, sediments, and pollutants on water quality, the ecosystem, and designated or potential uses of the estuarine zones.

(2) REPORTS.—The Administrator, in cooperation with the Administrator of the National Oceanic and Atmospheric Administration, shall submit to the Congress no less often than biennially a comprehensive report on the activities authorized under this subsection including—

(A) a listing of priority monitoring and research needs;

(B) an assessment of the state and health of the Nation's estuarine zones, to the extent evaluated under this subsection;

(C) a discussion of pollution problems and trends in pollutant concentrations with a direct or indirect effect on water quality, the ecosystem, and designated or potential uses of each estuarine zone, to the extent evaluated under this subsection; and

(D) an evaluation of pollution abatement activities and management measures so far implemented to determine the degree of improvement toward the objectives expressed in subsection (b)(4) of this section.

(k) DEFINITIONS.—For purposes of this section, the terms "estuary" and "estuarine zone" have the meanings such terms have in section 104(n)(4) of this Act, except that the term "estuarine zone" shall also include associated aquatic ecosystems and those portions of tributaries draining into the estuary up to the historic height of migration of anadromous fish or the historic head of tidal influence, whichever is higher.

【33 U.S.C. 1330】

## TITLE IV—PERMITS AND LICENSES

### CERTIFICATION

SEC. 401. (a)(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate,

G:\COMP\WATER2\FEDERAL WATER POLLUTION CONTROL ACT.XML

Sec. 401          **FEDERAL WATER POLLUTION CONTROL ACT**          248

that any such discharge will comply with the applicable provisions of sections 301, 302, 303, 306, and 307 of this Act. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 301(b) and 302, and there is not an applicable standard under sections 306 and 307, the State shall so certify, except that any such certification shall not be deemed to satisfy section 511(c) of this Act. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

(2) Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirement in such State, and within such sixty-day period notifies the Administrator and the licensing or permitting agency in writing of its objection to the issuance of such license or permit and requests a public hearing on such objection, the licensing or permitting agency shall hold such a hearing. The Administrator shall at such hearing submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency. Such agency, based upon the recommendations of such State, the Administrator, and upon any additional evidence, if any, presented to the agency at the hearing, shall condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot insure such compliance such agency shall not issue such license or permit.

(3) The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Administrator, as the case may be, which shall be given by the Federal agency to whom application is made for such operating license or permit, the State, or if appropriate, the inter-

G:\COMP\WATER2\FEDERAL WATER POLLUTION CONTROL ACT.XML

state agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 301, 302, 303, 306, and 307 of this Act because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 301, 302, 303, 306, or 307 of this Act.

(4) Prior to the initial operation of any federally licensed or permitted facility or activity which may result in any discharge into the navigable waters and with respect to which a certification has been obtained pursuant to paragraph (1) of this subsection, which facility or activity is not subject to a Federal operating license or permit, the licensee or permittee shall provide an opportunity for such certifying State, or, if appropriate, the interstate agency or the Administrator to review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated. Upon notification by the certifying State, or if appropriate, the interstate agency or the Administrator that the operation of any such federally licensed or permitted facility or activity will violate applicable effluent limitations or other limitations or other water quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is received from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 301, 302, 303, 306, or 307 of this Act.

(5) Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this Act that such facility or activity has been operated in violation of the applicable provisions of section 301, 302, 303, 306, or 307 of this Act.

(6) Except with respect to a permit issued under section 402 of this Act, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the person having such license or permit submits to the Federal agency which

G:\COMP\WATER2\FEDERAL WATER POLLUTION CONTROL ACT.XML

| Sec. 402 | FEDERAL WATER POLLUTION CONTROL ACT | 250 |

issued such license or permit a certification and otherwise meets the requirements of this section.

(b) Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

(c) In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

(d) Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 301 or 302 of this Act, standard of performance under section 306 of this Act, or prohibition, effluent standard, or pretreatment standard under section 307 of this Act, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

【33 U.S.C. 1341】

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM

SEC. 402. (a)(1) Except as provided in sections 318 and 404 of this Act, the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 301(a), upon condition that such discharge will meet either (A) all applicable requirements under sections 301, 302, 306, 307, 308, and 403 of this Act, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this Act.

(2) The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

(3) The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

**Vermont Agency of Natural Resources**
**Department of Environmental Conservation**

**Section 401 Water Quality Certification Practice**

## I. Purpose

Effective October 22, 2014, this Practice supersedes the "Section 401 Water Quality Certification Procedure" dated April 2, 2012.

It is the goal of this Practice to ensure a consistent application review and internal Agency of Natural Resources (Agency) coordination process with respect to Clean Water Act Section 401 water quality certification (WQC) decisions. The public notice and public hearing requirements relating to WQCs are contained in Section 13.11 of the Department's Vermont Water Pollution Control Permit Regulations dated February 26, 1974 (VWPCPR).

## II. Pre-Application Scoping Meeting with Project Proponent

The Department of Environmental Conservation (Department) strongly encourages that each applicant for a WQC attend a pre-application scoping meeting with representatives from the Agency's Departments. The Watershed Management Division's 401 Program Coordinator (401 Program Coordinator or Coordinator) will be responsible for working with applicants to schedule pre-application meetings. The Coordinator will also coordinate with division and department management to ensure that appropriate staff are included in such meetings.

## III. Application

(a) Section 13.11(b) of the VWPCPR states that a Section 401 WQC application shall contain sufficient information including "such additional information deemed necessary" to evaluate the application. The following subsections provide guidance on what the Department may require from a 401 WQC applicant.

(b) **Section 401 WQC Associated with a Federally-Issued General Permit.** In certain cases a federal agency may issue a general permit for which the Agency may grant general certification or waiver for certain categories of discharges or activities.

(c) **Application for Individual 401 Certifications not in Connection with a FERC License or Exemption.** An applicant for a federal license or permit will file a request for a WQC on a form provided by the Department, which is available at the Department's central offices in Montpelier or on the 401 Water Quality Certification website: dec.vermont.gov/business-support/water-quality-certification-section-401.

(d) (1) **Application for Certification in Connection with a FERC License or Exemption.** An applicant for a FERC license or exemption will file a request for a WQC on a form provided by the Department, which is available at the Department's central offices in Montpelier or on the Flow Protection - Hydroelectric Power website: dec.vermont.gov/rivers/streamflow-protection/hydroelectric. In addition to information on the application form, the project proponent will provide additional supporting information as follows:

1

ADD6

      (A) **FERC licensed projects using the Traditional Licensing Process (TLP):** license application and responses to any FERC additional information requests.

      (B) **FERC licensed projects using the Integrated Licensing Process (ILP):** license application.

      (C) **FERC exempt projects:** exemption application and the results of any environmental studies completed as part of the FERC process.

(2) For WQCs requested in connection with a FERC license or exemption, the timing of the application should be coordinated with the applicable FERC process.

      (A) **FERC licensed projects using the TLP.** Applicants that are using the TLP (18 CFR § 4.30 *et seq.*) may file a certification application following issuance of a Notice of Ready for Environmental Analysis (Notice indicates that FERC is ready to prepare the NEPA document) by FERC.

      (B) **FERC licensed projects using the ILP.** Applicants that are using the ILP (18 CFR § 5.1 *et seq.*) may file a certification application as early as the date the FERC license application is filed.

      (C) **FERC exempt projects.** Applicants may only file a certification application after results from all studies necessary to support the application are available and a complete project proposal has been developed.

(e) **Additional Materials Required.** Prior to making a decision on an application for a WQC, the Department may require that the applicant:

(1) perform various studies or environmental quality tests including chemical analyses of water, sediment, or fill material; biological assessments; and assessments of habitat suitability;

(2) pursuant to 3 V.S.A. § 2809, pay the cost of research, scientific, programmatic, or engineering expertise or services that the Department does not have when such expertise or services are required for the processing of the WQC application; and

(3) submit additional information necessary to make its anti-degradation findings pursuant to Vermont's Anti-Degradation Policy and any anti-degradation procedure or rule in effect at the time of application.

## IV. Determination of Administratively Complete Application

(a) **In General.** Within two weeks of receipt of an application, the Department will review the application and determine whether it is administratively complete. An "administratively complete application" is an application that has been determined to include all of the initially required documentation necessary to begin a technical review

of the application.  These documents include the correct completed application form(s) and supporting information, signatures, and fees.

(1) If an application is administratively complete, the Department will issue a letter to the applicant indicating the date of receipt of the application and its administrative completeness.

(2) If an application is not administratively complete, the Department will contact the applicant via phone, email, or letter, and inform the applicant of the materials needed to make the application administratively complete.  If the requested information is not provided within the timeframe provided by the Department, the application may be denied without prejudice and the applicant may reapply at any time.  The notice of denial will be provided via email or letter.

(b) **Coordination with Federal Agency; Decision Time Clock.**

(1) Section 401 of the federal Clean Water Act provides that a state must act on a request for certification within a "reasonable period of time," which cannot exceed one year after receipt of the request, or the certification requirement shall be waived.  Different federal agencies have defined in regulation what constitutes a "reasonable period of time" for state decision-making.  However, federal regulation also gives flexibility to federal agencies to either shorten or lengthen the period of time for states' decision-making.

(2) To avoid an inadvertent waiver of a WQC, the 401 Program Coordinator will contact the involved federal agency upon receipt of a WQC application to determine the federal agency's timeframe for noticing and issuing its federal license or permit.  The 401 Program Coordinator will document this timeline in writing.  If more time is needed to make a decision, the 401 Program Coordinator will request an extension and confirm in writing.  If the federal agency will not grant additional time, the Department may suggest to the applicant that it withdraw and resubmit its application, thereby restarting the clock, or the Department may deny the certification without prejudice if there is insufficient information to make a final decision and encourage the applicant to resubmit the application.

## V. Determination of Technically Complete Application

(a) **In General.**  For purposes of this Procedure a "technically complete application" means an application that contains a material record sufficient to support the creation of a draft decision for public notice purposes.

(b) **Internal Agency Coordination in Determination on Technical Completeness.**

(1) The Watershed Management Division (WSMD) Director will designate a lead WSMD program manager or staff person for an application who, in coordination with the 401 Coordinator, will ensure coordination in evaluating the technical completeness of the application and take the lead in writing the draft WQC decision.

(2) The 401 Program Coordinator, in coordination with the lead WSMD manager/staff, will ensure coordination with other affected Agency divisions and departments as follows.  Affected Agency divisions and departments may include the Department of Environmental Conservation (DEC); DEC's Watershed Management Division (WSMD); the following programs within WSMD:  the Lakes and Ponds Management and Protection Program, the Monitoring Assessment and Planning Program, the Rivers Program, the Stormwater Program, the Wastewater Program, and the Wetlands Program; and the Vermont Fish and Wildlife Department.

(A) Upon determining that an application is administratively complete, the 401 Program Coordinator will promptly provide written notification via email to all WSMD program managers, the WSMD Director and Deputy, and other affected Agency divisions and departments with a copy of the application.

(B) The 401 Program Coordinator will schedule a meeting to discuss the project and application and discuss assigned roles for evaluating the application and drafting a tentative decision.

(C) The 401 Program Coordinator will develop a single email address list for all Agency managers and staff involved in the review and processing of the application.  All involved staff and managers will use this email address throughout the application review and decision-making process to ensure internal coordination.

(D) The 401 Program Coordinator, in consultation with the lead WSMD manager/staff, will provide a date by which other affected divisions and departments must respond to the Coordinator as to whether the application is technically complete for their purposes and identify any additional information that is needed.

(E) If the 401 Program Coordinator determines that other Agency divisions and departments are not able to meet the specified deadline for response, the Coordinator will notify the WSMD Director/Deputy.  The Director/Deputy will work with the Coordinator, the Department Commissioner, and others as necessary to promptly resolve any timing issues.  Any disagreement among or between Agency divisions and departments should be identified early and brought to the Secretary if it cannot be promptly resolved.

(F) Once an application is deemed technically complete, the 401 Program Coordinator will notify the applicant in writing.  If an application is deemed technically incomplete, the 401 Program Coordinator will notify the applicant in writing with sufficient detail to identify the information or materials necessary to complete the application.

4

(G) If an application is technically incomplete, at the Department's sole discretion, no further processing of the application will take place until the information requested is received and determined to be technically complete. If the requested information is not provided within the timeframe provided by the Department, the application may be denied without prejudice and the applicant may reapply at any time. The Department will provide the notice of denial in writing.

(H) The Department may at any time require an applicant to submit any additional information that it considers necessary to make a determination that an application is technically complete. The application may be denied without prejudice if any requested information is not provided within the timeframe provided by the Department.

(c) **Special Provisions for Applications for Certification in Connection with a FERC License or Exemption.**

(1) The Department will process certain applications in connection with a FERC license or exemption within 120 days after a determination that an application is technically complete and Agency staff has had an opportunity to conduct a site visit at an appropriate time of year and during appropriate flow conditions. Projects qualifying for an expedited process are:

(A) Run-of-river projects at existing dams (no change to extent of impoundment) for which the proposal provides bypass flows consistent with the default hydrologic standards (Vermont Water Quality Standards, Section 3-0l(C)), and the proposal does not impact existing or designated uses or water quality criteria;

(B) Run-of-river projects at existing dams (no change to extent of impoundment) with short bypasses having the following characteristics:

(i) very low habitat value (e.g., very steep with prominent ledges), or

(ii) consisting solely of one or more pools with minimal flow needs to provide for movement of fish and to maintain water quality and aquatic habitat, and

(iii) the project site does not have aesthetic or recreational values (e.g., for some waterfalls) or provide habitat for threatened or endangered species;

(C) Conduit projects which are physically removed from state and federal waters and have no impact on water quality;

(D) Projects for which a 5 MW exemption application has been filed and accepted by FERC.

5

## VI.  Scope of Review for Application Decisions

Pursuant to Section 13.11(g)(3) of the VWPCPR, a WQC must contain "a statement that there is a reasonable assurance that the activity will be conducted in a manner that will not violate applicable water quality standards.  In making such determination, the Department will evaluate whether an activity complies with applicable state laws and Agency permits, rules, procedures, practices, and policies that ensure compliance with the VWQS.

## VII.  Coordination in Formation of Tentative Determination on WQC Application.

Prior to issuing a draft WQC determination for public comment, the 401 Program Coordinator will ensure appropriate coordination with other affected Agency divisions and departments as follows:

(1) Prior to issuing a draft tentative determination for public notice, a draft will be provided to other affected Agency divisions and departments with a specified period of time to participate in drafting and providing comments.

(2) The 401 Program Coordinator and lead WSMD program manager/staff will ensure that comments of other Agency divisions and departments are considered prior to the issuance of a tentative determination for public comment and will coordinate internal meetings and discussions as needed.  In the case of any conflicts or disagreements among or between divisions and departments, the WSMD Director/Deputy will work with the lead Division program manager, the Commissioner, and others as necessary to promptly resolve any disagreements.  Any disagreement among or between Agency divisions or departments should be identified early and brought to the Secretary if they cannot be promptly resolved at the department level.

(3) If the 401 Program Coordinator determines that other Agency divisions or departments are not able to meet the specified deadline for comment, the WSMD Director/Deputy and lead WSMD program manager will work with the Commissioner and others to resolve any timing issues.  Any disagreement among or between Agency divisions and departments should be identified early and brought to the Secretary if they cannot be promptly resolved at the department level.

## VIII.  Content of Certification Decision

(a) Section 13.11(g) of the VWPCPR states the information that the Department must include in a WQC and grants the Department the authority to include such other information as the Department may determine appropriate and any conditions the Department deems necessary.  Pursuant to 13.11(g) a WQC must contain:

(1) The name and address of the applicant;

(2) A statement of the record upon which the decision is based;

(3) A statement that the Secretary has examined:

6

ADD11

(A) the application made by the applicant to the Secretary for certification;

(B) the application made to the federal licensing or permitting agency (specifically identifying the number or code affixed to such application) and bases his or her decision upon an evaluation of the information contained in such application which is relevant to water quality considerations; and

(C) any other information furnished by the applicant sufficient to permit the Secretary to issue a WQC;

(4) A statement that there is a reasonable assurance that the activity will be conducted in a manner which will not violate the Vermont Water Quality Standards and other appropriate requirements of state law and will be in compliance with Sections 301, 302, 303, 306, and 307 of the federal Clean Water Act, 33 U.S.C. § 1251 *et seq.*, as amended;

(5) A statement of any conditions which the Secretary deems necessary or desirable with respect to discharge or activity;

(6) A condition vesting the Secretary with the authority to reopen and alter or amend the certification conditions over the life of the project when such action is necessary to assure compliance with the Vermont Water Quality Standards and other appropriate requirements of state law;

(7) A condition stating that authorized representatives from the Agency, at reasonable times and upon presentation of credentials, may enter upon the site where the activity is taking place for purposes of inspecting and determining compliance with certification conditions;

(8) The following statement concerning the effective date and expiration of the certification. The Certification will become effective on the date of issuance, and the conditions of the Certification will become conditions of the federal license or permit (33 U.S.C. § 1341(d)). If the federal authority denies a license or permit, the Certification becomes null and void. Otherwise, it runs for the term of the federal license or permit.

(9) The following statement concerning enforcement of the certification. This Certification is only valid for those activities that fully comply with the terms and conditions of the federal license of permit and this Certification. The Agency reserves the authority to enforce any violation of the VWQS that results from any activity or discharge and to enforce all other state laws applicable to such activities and discharges.

(10) Appeals language.

7

ADD12

(A) For renewable energy projects:  If this decision relates to a renewable energy plant for which a certificate of public good is required under 30 V.S.A. § 248, any appeal of this decision must be filed with the Vermont Public Service Board pursuant to 10 V.S.A. § 8506.  This section does not apply to a facility that is subject to 10 V.S.A. § 1004 (dams before the Federal Energy Regulatory Commission), 10 V.S.A. § 1006 (certification of hydroelectric projects) or 10 V.S.A. Chapter 43 (dams).  Any appeal under this section must be filed with the Clerk of the Public Service Board within 30 days of the date of this decision; the appellant must file with the Clerk an original and six copies of its appeal.  The appellant will provide notice of the filing of an appeal in accordance with 10 V.S.A. § 8504(c)(2), and will also serve a copy of the Notice of Appeal on the Vermont Department of Public Service.  For further information, see the Rules and General Orders of the Public Service Board, available on line at www.psb.vermont.gov.  The address for the Public Service Board is 112 State Street, Montpelier, Vermont, 05620-2701 (Tel. # 802-828-2358).

(B) For all other projects:  Pursuant to 10 V.S.A. Chapter 220, any appeal of this decision must be filed with the clerk of the Environmental Division of the Superior Court within 30 days of the date of the decision.  The Notice of Appeal must specify the parties taking the appeal and the statutory provision under which each party claims party status; must designate the act or decision appealed from; must name the Environmental Division; and must be signed by the appellant or the appellant's attorney.  In addition, the appeal must give the address or location and description of the property, project, or facility with which the appeal is concerned and the name of the applicant or any permit involved in the appeal.  The appellant must also serve a copy of the Notice of Appeal in accordance with Rule 5(b)(4)(B) of the Vermont Rules for Environmental Court Proceedings.  For further information, see the Vermont Rules for Environmental Court Proceedings, available on line at www.vermontjudiciary.org.  The address for the Environmental Division is:  32 Cherry St.; 2nd Floor, Suite 303; Burlington, VT 05401 (Tel. # 802-951-1740).

## IX.  Public Notice and Comment; Public Hearing; Issuance of Decision

The Department will provide public notice of and opportunity for written comments regarding the proposed activity and the tentative determination to issue or deny certification.  The public notice will be issued in accordance with Section 13.11(c) of the VWPCPR.  The Department will also provide an opportunity for a public meeting in accordance with Sections 13.11(d), (e), and (f) of the VWPCPR.  After consideration of public comments, the Agency will make a final decision on the application.

ADD13

<u>ADOPTED C. JANUARY 17, 1974 PURSUANT TO 10 V.S.A. § 1258(6)</u>
<u>FILED WITH SECRETARY OF STATE FEBRUARY 26, 1974</u>

**VERMONT WATER POLLUTION CONTROL PERMIT REGULATIONS**

13.    PERMITS

13.1  <u>Definitions</u>.

As used in these regulations the following terms shall have the meanings indicated below unless a different meaning clearly appears from the context:

(a)    The term "Act" means Title 10, Chapter 47 of the Vermont Statutes Annotated, as amended.

(b)    The term "Agency" means the Vermont Agency of Environmental Conservation.

(c)    The term "Federal Act" means the Federal Water Pollution Control Act, as amended, 33 U.S.C. 1251 et seq.

(d)    The term "Refuse Act" means section 13 of the River and Harbor Act of March 3, 1899.

(e)    The term "EPA" means the U.S. Environmental Protection Agency.

(f)    The term "Administrator" means the Administrator of EPA.

(g)    The term "Regional Administrator" means the Regional Administrator of EPA, Region I.

(h)    The term "National Pollutant Discharge Elimination System (NPDES)" means the national system for the issuance of permits under section 402 of the Federal Act and includes the Vermont program after it has been approved by the Administrator pursuant to section 402 of the Federal Act.

(i)    The term "incompatible substance" means any waste being discharged into a publicly owned treatment works which interferes with, passes through without treatment, or is otherwise incompatible with such works or would have a substantial adverse affect on such works or on water quality.

ADD14

13.3    Agency Processing of Completed Applications.

a. Determination as to Type of Permit.  When an application for an existing discharge is found to be complete, the Secretary shall make determinations as to the type of permit to be issued.  If the discharge will neither (i) reduce the quality of the receiving waters below the classification established for such waters nor (ii) violate any state or federal laws or regulation, then the application shall be determined to be an application for a discharge permit under section 1263 of the Act.  Otherwise, the application shall be determined to be an application for a temporary pollution permit under section 1265 of the Act.  Any such temporary pollution permit shall contain the additional conditions set forth in section 13.4(b)(3) of these regulations.

b. Formulation of Tentative Determination and Draft Permit.

(1)                The Secretary shall formulate and prepare tentative determinations with respect to an application in advance of public notice of the proposed issuance or denial of a permit.  Such tentative determinations shall state whether the permit is a discharge permit or a temporary pollution permit and shall include at least the following:

(a)  A proposed determination to issue or deny a permit for the discharge described in the application; and,

(b)  If the determination proposed in paragraph 1 of this section is to issue the permit, the following additional tentative determinations:

(i)  Proposed effluent limitations, identified pursuant to sections 13.4(b) and (c) for those pollutants proposed to be limited;

(ii)  A proposed schedule of compliance, including interim dates and requirements, for meeting the proposed effluent limitations, identified pursuant to section 13.4(d);

(iii)  A proposed set of periodic pollution charges to be applied in the case of any temporary pollution permit; and

(iv)  A brief description of any other proposed special conditions (other than those required in section 13.4 (e) which will have a significant impact upon the discharge described in the application.

(2)        The Secretary shall organize the tentative determinations prepared pursuant to paragraph (1) of this section into a draft permit for the application.

c. Public Notice

(1)        Public notice of every complete application for a permit shall be circulated in a manner designed to inform interested and potentially interested persons of the proposed discharge and of the proposed determination to issue or deny a permit for the proposed discharge.  Procedures for a circulation of public notice shall include at least the following:

(a)        Notice shall be circulated within the geographical areas of the proposed discharge; such circulation may include any or all of the following:

(i)  Posting in the post office and public places of the municipality nearest the premises of the applicant in which the effluent source is located;

           (ii)     Posting near the entrance to the applicant's premises and in nearby places; and

           (iii)    Publishing in local newspapers and periodicals, or, if appropriate, in a daily newspaper of general circulation;

   (b)          Notice shall be mailed to any person or group upon request; and

   (c)          The Secretary shall add the name of any person or group upon request to a mailing list to receive copies of notices for all applications within Vermont or within a certain geographical area.

  (2)          The Secretary shall provide a period of not less than thirty (30) days following the date of the public notice during which time interested persons may submit their written views on the tentative determinations with respect to the application. All written comments submitted during the 30-day comment period shall be retained by the Secretary and considered in the formulation of this final determinations with respect to the application. The period for comment may be extended at the discretion of the Secretary.

  (3)          The contents of public notice of applications for permits shall include at least the following:

   (a)          Name, address, phone number of the Agency;

   (b)          Name and address of each applicant;

   (c)          Brief description of each applicant's activities or operations which result in the discharge described in the application (e.g., municipal waste treatment plant, steel manufacturing, drainage from mining activities);

(d)         Name of waterway to which each discharge is made and a short description of the location of each discharge on the waterway indicating whether such discharge is a new or an existing discharge;

(e)         A statement of the tentative determination to issue or deny a permit for the discharge described in the application;

(f)         A brief description of the procedures for the formulation of final determinations, including the 30-day comment period required by paragraph (c)(2) of this section and any other means by which interested persons may influence or comment upon those determinations; and

(g)         Address and phone number of Agency premises at which interested persons may obtain further information, request a copy of the draft permit prepared pursuant to section 13.3(b), request a copy of the fact sheet described in section 13.3(d) and inspect any copy forms and related documents.

d. <u>Fact Sheets</u>

(1)         For every discharge which has a total volume of more than 500,000 gallons on any day of the year, the Secretary shall prepare and, following public notice, shall send, upon request to any person a fact sheet with respect to the application described in the public notice.  The contents of such fact sheets shall include at least the following information:

(a)         A sketch or detailed description of the location of the discharge described in the application;

(b)         A quantitative description of the discharge described in the application which includes at least the following:

(i)  The rate of frequency of the proposed discharge;

if the discharge is continuous, the average daily flow in gallons per day or million gallons per day;

(ii)  For thermal discharges subject to limitation under the Act or the Federal Act, the average summer and winter temperatures in degrees Fahrenheit; and

(iii)  The average daily discharge in pounds per day of any pollutants which are present in significant quantities or which are subject to limitations or prohibition under sections 301, 302, 306, 307 of the Federal Act and regulations published thereunder;

(2)  The tentative determinations required under section 13.3(b);

(3)  A brief citation, including a brief identification of the uses for which the receiving waters have been classified, of the water quality standards and effluent standards and limitations applied to proposed discharge; and

(4)              A fuller description of the procedures for the formulation of final determinations than that given in the public notice including:

(i)  The 30-day comment period required by 13.3 (b) (2);

(ii)  Procedures for requesting a public hearing and the nature thereof; and

(iii) Any other procedures by which the public may participate in the formulation of the final determinations.

(5) The Secretary shall add the name of any person or group upon request to a mailing list to receive copies of fact sheets.  The Secretary may charge a reasonable fee for copies of fact sheets, draft permits and other documents.

e. <u>Notice of Other Government Agencies</u>.

The Secretary shall notify other appropriate Government agencies of each complete application for a permit and shall provide such agencies an opportunity to submit their written views and recommendations. Procedures for such notification shall include the following:

(1)                     At the time of issuance of public notice pursuant to section 13.3(c) transmission of such notice and, in cases where a fact sheet is required to be prepared, a fact sheet to any other States whose waters may be affected by the issuance of a permit and, upon request, providing such States with a copy of the application and a copy of the proposed permit prepared pursuant to section 13.3 (b). Each affected State shall be afforded an opportunity to submit written recommendations to the Secretary and to the Regional Administrator which the Secretary may incorporate into the permit if issued. Should the Secretary fail to incorporate any written recommendations thus received, he shall provide to the affected State or States (and to the Regional Administrator) a written explanation of his reasons for failing to accept any of the written recommendations.

(2)                     A procedure, similar to paragraph (1) of this section, for notifying any interstate agency having water quality control authority over waters which may be affected by the issuance of a permit.

(3)                     At the time of issuance of public notice pursuant to section 13.3(c), transmission of such notice and, where a fact sheet is required to be prepared, a fact sheet to the appropriate District Engineer of the Army Corps of Engineers of applications for discharges

(other than minor discharges) into navigable waters:

     (a)    The Secretary and the Corps of Engineers may enter into written agreements providing for (i) notice to the District Engineer of minor discharges, (ii) waiver by the Corps of Engineers of its right to receive fact sheets with respect to classes, types, and sizes within any category of point sources and with respect to discharges to particular navigable waters or parts thereof and (iii) any procedures for the transmission of forms, period for comment by the Corps of Engineers and for objections of the Corps of Engineers.

     (b)    A written copy of any agreements between the Agency and the Corps of Engineers shall be made available to the public for inspection and copying.

    (4)    A procedure for mailing copies of the public notice (or upon specific request, copies of fact sheets) for application for permits to any other Federal, Vermont or local agency, or any affected country, upon request, and providing such agencies an opportunity to respond, comment, or request a public hearing pursuant to section 13.3(c).  Such agencies shall include at least the agency responsible for the preparation of an approved plan pursuant to section 208(b) of the Federal Act.

    (5)               Procedures for notice to and coordination with appropriate public health agencies for the purpose of assisting the applicant in coordinating the applicable requirements of the Act or the Federal Act with any applicable requirements of such public health agencies.

f. Public Access to Information.

   (1)                The Secretary shall insure that any forms
(including the draft permit prepared pursuant to section 13.3(b)(2) of
any public comment upon those forms pursuant to section 13.3(c)(2) shall
be available to the public for inspection and copying.  The Secretary, in
his discretion may also make available to the public any other records,
reports, plans, or information obtained by the Agency.

   (2)                The Secretary shall protect any information (other
than effluent data) contained in such form, or other records, reports, or
plans as confidential upon showing by any person that such information if
made public would divulge methods or processes entitled to protection as
trade secrets of such person.  If, however, the information being
considered for confidential treatment is contained in a form, the
Secretary shall forward such information to the Regional Administrator for
his concurrence in any determination of confidentiality pursuant to the
agreement between EPA and the Agency described in section 13.2(c).

   (3)                Any information accorded confidential status,
whether or not contained in a form, shall be disclosed, upon request, to
the Regional Administrator, or his authorized representative.

   (4)                The Secretary shall provide facilities for the
inspection of information relating to forms and shall insure that Agency
employees honor requests for such inspection promptly without undue
requirements or restrictions.  The Secretary shall either (a) insure that
a machine or device for the copying of papers and documents is available
for a reasonable fee, or (b) otherwise provide for or

coordinate with copying facilities or services such that requests for copies of nonconfidential documents may be honored promptly.

g. <u>Public Hearings</u>

The Secretary shall provide an opportunity for the applicant, any affected Vermont Agency, any affected interstate agency, any affected country, the Regional Administrator, or any interested agency, person, or group of persons to request or petition for a public hearing with respect to applications.  Any such request or petition for public hearing shall be filed within the 30-day period prescribed in section 13.3(c)(2) and shall indicate the interest of the party filing such request and the reasons why a hearing is warranted.  The Secretary shall hold a hearing if there is a significant public interest (including the filing of requests or petitions for such hearing) in holding such a hearing.  Instances of doubt should be resolved in favor of holding the hearing.  Any hearing brought pursuant to this subsection shall be held in the geographical area of the proposed discharge or other appropriate area, in the discretion of the Secretary, and may, as appropriate, consider related groups of permit applications.

h. <u>Public Notice of Public Hearings</u>.

(1)            Public notice of any hearing held pursuant to section 13.3(g) above shall be circulated at least as widely as was the notice of the application.  Procedures for the circulation of public notice for hearings held under section 13.3(g) shall include at least the following:

(a)    Notice shall be published in at least one newspaper of general circulation within the geographical area of the discharge;

(b)    Notice shall be sent to all persons and Government agencies which received a copy of the notice or the fact sheet for the application;

(c)    Notice shall be mailed to any person or group upon request; and

(d)    Notice shall be effected pursuant to subparagraphs (a) and (c) of this paragraph at least thirty (30) days in advance of the hearing.

(2)    The contents of public notice of any hearing held pursuant to section 13.3(g) shall include at least the following:

(a)    Name, address, and phone number of the Agency;

(b)    Name, address of each applicant whose application will be considered at the hearing;

(c)    Name of waterway to which each discharge is made and a short description of the location of each discharge on the waterway;

(d)    A brief reference to the public notice issued for each application, including identification number and date of issuance;

(e)    Information regarding the time and location for the hearing;

(f)    The purpose of the hearing;

(g)    A concise statement of the issues raised by the persons requesting the hearing;

(h)    Address and phone number of Agency premises at which interested persons may obtain further information, request a copy of each draft permit prepared pursuant to section 13.3(b)

(2)      above, request a copy of each fact sheet prepared pursuant to section 13.3(d) and inspect and copy forms and related documents; and

(i)                    A brief description of the nature of the hearing, including the rules and procedures to be followed.

13.3i    <u>PROCEDURE FOR PUBLIC HEARINGS</u>

(1)      Except as provided in paragraph (4) of this section, where the Secretary finds a significant degree of public interest in a proposed permit or group of permits, he shall hold a public hearing to consider such permit or permits.  Public notice of such hearing shall be given in a manner specified in subsection (h) of this rule.

(2)      Hearings held pursuant to this section shall be conducted by the Secretary of his designee.

(3)      Any person shall be permitted to submit oral or written statements and data concerning the proposed permit.  The Secretary shall have discretion to fix reasonable limits on the time allowed for oral statements and may require the submission of statements in writing.

(4)      If the Secretary determines the useful information and data may be obtained thereby, the Secretary may hold a public hearing anytime prior to the issuance of the permit.  Notice of a public hearing pursuant to this section shall be circulated 30 days prior to the hearing.  The hearings shall be conducted in a manner set forth in paragraphs (2) and (3) of this section. All statements, comments and data presented at the hearing shall be retained by the Secretary and considered in the formulation of his determination. Where a public hearing is held pursuant to this paragraph, no public hearing is required pursuant to paragraph (1) above.

Rule 13.11 follows.

of any facilities to treat such discharge, which may include arrangements for the municipality to operate and maintain such facilities.  In such cases, the Secretary may issue each permit to the municipality or to both the municipality and the owner of the facilities.

**RULE 13.11    CERTIFICATION OF ACTIVITIES REQUIRING FEDERAL LICENSE OR PERMIT.**

(a)    Certifying Agent:

The certifying agent shall be the commissioner of the department of water resources.

(b)    Application for Certification

Application for certification pursuant to section 401 of PL 92-500 or any amendments thereto shall be made to the commissioner of the department of water resources, agency of environmental conservation.  The application shall contain information sufficient to determine that any discharge will comply with the applicable provisions of section 301, 302, 306, and 307 of PL 92-500, and, as minimum requirements, shall include a description of the location, manner, volume, nature, frequency and duration of the discharge and such additional information deemed necessary by the commissioner.

(c)    Public Notice:

The commissioner shall give notice of an application for certification in the manner as provided in Rule 13.3 c.

(d)    Public Hearings:

Public hearings with respect to applications for certification shall be governed by Rule 13.3 g.

(e)    Notice of Public Hearings:

Public notice of any hearing to be held with respect to any application for certification shall be governed by the provisions of Rule 13.3 h.

(f)    <u>Procedure for Public Hearings</u>:

   Procedure for public hearings with respect to an application for certification shall be conducted according to the provisions of Rule 13.3i (2) and (3).

(g)    <u>Content of Certification</u>:

   (1)    Name and address of applicant.

   (2)    A statement that the certifying agency has either (i) examined the application made by the applicant to the licensing or permitting agency (specifically identifying the number or code affixed to each application) and bases of its certification upon an evaluation of the information contained in such application which is relevant to water quality considerations, or (ii) examined other information furnished by the applicant sufficient to permit the certifying agency to make the statement described in subparagraph (3) of this paragraph;

   (3)    A statement that there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards;

   (4)    A statement of any conditions which the certifying agency deems necessary or desirable with respect to the discharge or the activity; and,

   (5)    Such other information as the certifying agency may determine to be appropriate.

   (6)    The certifying agency may modify the certification in such manner as may be agreed upon by the certifying agency and the regional administration (EPA).

Re-typed to create clean copy.